STATE EX REL. LA FOLLETTE, Petitioner, v. DEMOCRATIC PARTY OF UNITED STATES OF AMERICA, and others, Respondents.

Supreme Court

*No. 79–1328–OA. Argued November 19, 1979.—Decided January 19, 1980.*
(Also reported in 287 N.W.2d 519.)

476

For the petitioner the cause was argued by *Bronson C. La Follette*, attorney general, with whom on the briefs were *Charles D. Hoornstra, Nancy L. Arnold*, and *F. Joseph Sensenbrenner, Jr.*, assistant attorneys general.

For the Democratic Party of the United States of America and Democratic National Committee there was a brief by *Ronald D. Eastman, Lynda S. Mounts, Richard S. Surrey* and *Cadwalader, Wickersham & Taft*, and oral argument by *Ronald D. Eastman*, all of Washington, D.C.

For the Democratic Party of Wisconsin there were briefs by *Robert H. Friebert* and *Friebert & Finerty* of Milwaukee, and oral argument by *Robert H. Friebert*.

SHIRLEY S. ABRAHAMSON, J. On August 29, 1979, Attorney General Bronson C. La Follette filed a Petition for Leave to Commence an Original Action for Declaratory and Injunctive Relief in this court on behalf of the State of Wisconsin and the people of the state upon a request by the governor, pursuant to sec. 165.25, Stats.[1] The named respondents, the Democratic Party of the United States of America (National Party), the Democratic National Committee (National Committee)[2] and the Democratic Party of Wisconsin (State Party) joined the Attorney General in requesting this court to take original jurisdiction. On September 12, 1979, the court granted the petition for leave to commence an original action. On September 28, 1979, the parties filed a stipulation of facts along with exhibits; briefs were filed by all parties and oral argument was heard on November 19, 1979.

The sole source of conflict between the petitioner and respondents is that the Wisconsin presidential preference primary is an open primary: The Wisconsin statutes permit voters to participate in the presidential preference primary without requiring them to declare publicly their party preference. The National Party has stated that "the only Wisconsin delegation which will be seated [at the national convention] is one which complies with all of the National Party Rules including Rule 2A"[3] which requires that voters in the primary declare their preference for the Democratic Party and have that preference publicly recorded.

---

[1] Sec. 165.25(1), Stats., provides: "The department of justice shall . . . , if requested by the governor or either branch of the legislature, appear for the state and prosecute or defend in any court or before any officer any cause or matter, civil or criminal, in which the state or the people thereof may be interested . . . ."

[2] We use "National Party" to include both the National Party and the National Committee.

[3] Stipulation of facts, par. 17.

The Attorney General, joined by the State Party, argues that the Wisconsin law is constitutional and binding on the State and National Parties. The National Party maintains that the presidential preference primary (the open primary) permits non-Democratic voters to have a significant impact on the selection of a Democratic presidential candidate and that therefore the open primary violates its constitutionally guaranteed freedom to associate for political purposes.[4]

In deciding the issue presented, this court is called upon to balance overlapping and to some extent conflicting rights and interests: that of the National Party and its adherents to associate for the advancement of political beliefs, including the nomination of candidates for political office; that of Wisconsin citizens to cast their votes in the primary election, a significant step in the process of electing the President of the United States; that of Wisconsin citizens not to have their association with a political party a matter of public record; that of the state to protect and preserve the integrity of the nominating process and to conduct the primary, and

---

[4] The first amendment to the federal constitution (applicable to this state by the fourteenth amendment) provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Sec. 4, Art. I of the Wisconsin Constitution provides:

"The right of the people peaceably to assemble, to consult for the common good, and to petition the government, or any department thereof, shall never be abridged."

The basis for freedom of association appears to be several constitutional guarantees, including the rights of free speech, free press, petition, assembly, and vote. *NAACP v. Alabama*, 357 U.S. 449, 460 (1958); Fellman, *The Constitutional Right of Association* 38 (1963); Note, *Freedom of Association and the Selection of Delegates to National Political Conventions*, 56 Cornell L. Rev. 148, 152–153 (1970).

political party participation therein, in a fair and orderly manner.

There is no simple test readily applicable for balancing these rights and interests or for determining which election laws are valid and which are invidious. Not every limitation or incidental burden on the right to associate or on the right to vote is unconstitutional. A state can substantially affect these rights where there is a sufficiently important state interest. Deciding the validity of election laws is, as the United States Supreme Court has said, "very much a 'matter of degree,' . . . very much a matter of 'consider[ing] the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification.' " *Storer v. Brown*, 415 U.S. 724, 730 (1973).

For over seventy-five years this state has conducted primary elections in the belief that the primary wrests the control over the selection of candidates from party bosses, caucuses and conventions and puts the control where it belongs—with the people of the state and that the open presidential preference primary (compared to a closed primary) increases the opportunity of the citizens of this state to participate at a critical stage of the process of electing a President.

For the reasons we set forth below, we conclude that the open primary does not impose an unconstitutional burden on the associational rights of the National Party. The National Party has not presented a factual basis to support its assertion that the open primary significantly differs from a primary in which public declaration of party preference is required with regard to permitting those who do not share the National Party's values or goals to influence the selection of the Democratic candidate. Nor do we view the open primary law as an un-

constitutional burden on the National Party's right to govern its affairs through the national convention. We determine that Wisconsin has a compelling state interest in having a primary and in not requiring that voters publicly declare their party preference and have that preference publicly recorded. Accordingly, we hold that the Wisconsin open primary law violates neither the state nor the federal constitution.[5]

We shall discuss in turn the Wisconsin election laws, the National Party's delegate selection rules and the conflict between the two; the historical background of the Wisconsin presidential preference vote and the relationship of the state and the political party in the candidate selection process; the National Party's claim that the open primary constitutes a substantial burden on its associational rights because non-Democratic voters significantly affect the selection of a Democratic Party candidate; and the state's compelling interest in its open primary law.

## I.

We turn first to a brief discussion of the Wisconsin presidential preference vote, the National Party's delegate selection rules and the conflict between the two.

## A.

The Wisconsin legislature has enacted a comprehensive set of laws governing the election of national, state and local officers. Title II, Chs. 5–12, Stats. The laws in issue in this case relate to the presidential preference vote at the spring election held on the first Tuesday in April in each year in which the electors for president and vice-president are to be elected. Secs. 5.02(21), 8.12(1) (in-

---

[5] This court upheld the constitutionality of an open primary statute in *State ex rel. Van Alstine v. Frear*, 142 Wis. 320, 339, 125 N.W. 961 (1910).

tro.), Stats. The text of the applicable statutes are set forth in the appendix.

Through these statutory provisions, the legislature has detailed the exclusive manner for conducting a presidential preference primary in which "the voters of this state shall . . . be given an opportunity to express their preference for the person to be the presidential candidate *of their party."* (Emphasis supplied.) Secs. 8.12, 5.62(1), (2), 5.60(8), 5.02(13), Stats. The manner by which the voters cast their votes for the candidate of their party is carefully prescribed by statute.

Where paper ballots are used, there is a separate presidential preference ballot for each party. Each voter is given the ballots of all parties participating in the presidential preference vote, and in the privacy of the voting booth, selects the ballot of the party of his choice, and indicates a choice for candidate on that ballot. Secs. 5.60(8), 10.02(3) (intro.), (a), (b) 2, 3, Stats. If the voter chooses not to vote for one of the candidates named on the ballot of his party, the voter may nominate another person by write-in vote or may vote against all the choices offered on the ballot of his party. Secs. 5.60(8) (intro.), (a), 10.02(3) (b) 3, Stats. The voter then detaches the chosen ballot from the remaining ballots and folds it so that its face is concealed and the printing and signatures or initials of the two ballot election clerks on the back of the ballot are visible. The voter folds the unmarked ballots in like manner. After leaving the voting booth, the voter delivers all the ballots to the voting inspectors; the one on which the voter has expressed a presidential preference is deposited in the ballot box, and the remaining ballots are deposited in the blank ballot box. Secs. 5.60(8) (d), 10.02(3) (a) and (f), Stats. Immediately after the canvass the inspectors destroy the ballots deposited in the blank ballot box. Sec. 5.60(8) (e), Stats.

Where voting machines are used, all candidates' names entitled to appear on the ballots appear on the machine. The voter can vote for candidates of only one party. The voter makes the party choice in the privacy of the voting booth. Secs. 5.37(1), (4), 10.02(3)(intro.), (a), (b) 2, 3 and (f), Stats.

In order to vote in the primary the Wisconsin voter is not required to declare publicly a party preference or to have that preference publicly recorded. Each voter makes a choice of party in the privacy of the voting booth. It is this facet of the Wisconsin law, the "private declaration" of party preference in the voting booth as compared with a public, recorded declaration that characterizes the Wisconsin presidential preference vote as an "open primary."

Wisconsin voters do not select *delegates* to the National Party's national convention by means of the presidential preference primary. Delegates to the national convention are selected by the state party, not by the voters of the state. The Wisconsin statute explicitly states that "[t]he method of selecting the delegates or alternates shall be determined by the state party organization." Sec. 8.12 (3)(b), Stats. The statute stipulates that not less than two-thirds of the convention votes be allotted to congressional districts and that these delegates and alternates be selected by the party organizations of each district. Sec. 8.12(3)(b), Stats.

The statute requires that each delegate file with the chairperson of the party a written declaration of acceptance, in the form of an affidavit, which states that the delegate "is affiliated with the political party which selected him as a delegate or alternate to its national political convention." Sec. 8.12(3)(c) 4, Stats. The State Party limits participation in the selection of delegates to

the national convention to "persons who are willing to subscribe to the general principles of the Democratic Party and do so publicly by executing an appropriate statement to that effect."[6]

The convention delegates are bound for a limited period by the outcome of the presidential preference vote in their respective districts or by the outcome of the total presidential vote in the state at large. Sec. 8.12(3)(b), Stats. Each delegate must pledge (in the filed affidavit referred to earlier) to support the candidate to whom the delegate is bound and to vote for the candidate on the first ballot and on any additional ballot, unless the candidate dies or releases the delegate or until the candidate fails to receive at least one-third of the votes authorized to be cast. Thereafter the delegate's vote at the convention is based on personal preference. Sec. 8.12(3)(c) 5, Stats.

Thus the sole function of the Wisconsin presidential preference primary is to apportion the number of delegates among the presidential candidates on the ballot for that party. The process of selecting the convention delegates in Wisconsin is under the control and direction of the State Party.

### B.

The National Party regulates the selection of delegates in its Charter, in its Delegate Selection Rules for the 1980 Democratic National Convention and in its Final Call for the 1980 Democratic National Convention. As the National Party points out in its brief, these documents reflect to a large extent the results of various studies made by the National Party beginning in 1968.

---

[6] Brief of the Democratic Party of Wisconsin, Respondent and Cross-Claimant, at 9; Stipulation of facts, par. 19.

Changes in the procedures for selecting national convention delegates were designed to give "all Democratic voters . . . a full, meaningful and timely opportunity to participate."[7]

Under the National Party's Rules, state parties may select their delegates to the national convention by primary, caucus or convention.[8] Whichever process is used by the state party, that process must meet certain requirements prescribed by the Charter and the Party Rules. Article 2, sec. 4, of the Charter states:

*"The National Convention shall be composed of delegates who are chosen through processes which* (i) *assure all Democratic voters full, timely and equal opportunity to participate and include affirmative action programs toward that end,* (ii) *assure that delegations fairly reflect the division of preferences expressed by those who participate in the Presidential nominating process,* (iii) *exclude the use of the unit rule at any level,* (iv) *do not deny participation for failure to pay a cost, fee or poll tax,* (v) restrict participation to Democrats only, *and* (vi) *begin within the calendar year of the Convention."* (Emphasis supplied.)

Rule 2 of Delegate Selection Rules for the 1980 Convention (Party Rules) (June 9, 1978) regulates participation in the Delegate Selection Process as follows:

"Rule 2   PARTICIPATION

"A. *Participation in the delegate selection process in primaries or caucuses shall be restricted to Democratic*

---

[7] *Mandate for Reform: A Report of the Commission on Party Structure and Delegate Selection to the Democratic National Committee* (1970) 9. For a discussion of party reform and national political conventions, *see* Bickel, *Reform and Continuity, The Electoral College and Convention, and the Party System* (1971); Ranney, *Curing The Mischiefs of Faction* (1975); Segal, *Delegate Selection Standards: The Democratic Party's Experience,* 38 Geo. W.L. Rev. 873 (1970).

[8] Delegate Selection Rules for the 1980 Democratic National Convention, Rules 2, 12; Stipulation of facts, par. 18.

*voters only who publicly declare their party preference
and have that preference publicly recorded.* Documentary
evidence of a process which complies with this rule shall
accompany all state Delegate Selection Plans upon their
submission to the National Party. Such rules, when ap-
proved by the Compliance Review Commission and im-
plemented shall constitute adequate provisions within the
meaning of Section 9 of the 1972 Democratic National
Convention mandate.[9]

"B. A Rule 20 exemption shall not be granted from
Rule 2.A requirements.

"C. A State Party which is precluded by state statute
from complying with this rule, shall adopt and implement
an alternative party-run delegate selection system which
complies with this rule.

"D. State Parties shall take all feasible steps to en-
courage non-affiliated and new voters to register or
enroll as Democrats and to provide simple, easy proce-
dures through which they may do so.

"E. No person shall be excluded from any stage of the
delegate selection process for failure to pay a cost or
fee." (Emphasis supplied.)

In the Final Call for the 1980 Democratic Convention
(the Call),[10] adopted by the National Committee on May
25, 1979, the National Committee provides that "dele-
gates and alternates to the 1980 Democratic National
Convention shall be selected in accordance with the Dele-
gate Selection Rules." The Party Rules established a
Compliance Review Commission to "review . . . Delegate
Selection Plans submitted by State Parties and approve
or recommend changes in such plans." Rule 19(A).

[9] Party Rule 2 in 1976 contained a provision which required
public declaration of party preference. The 1976 Rules allowed
exemptions from Rule 2 and the State Party obtained an exemption
in 1976. Stipulation of facts, par. 16.

[10] "The Call formally establishes the date of the Convention,
the qualification for delegates, the Convention procedures, and
other rules essential to the conduct of the Convention." Stipula-
tion of facts, par. 10.

## C.

On May 11, 1979, the Chairman of the Wisconsin State Party sent the Wisconsin Delegate Selection Plan for 1980 (which incorporated the provisions of the Wisconsin open primary law) to the Compliance Review Commission.[11] On July 19, 1979, the Commission determined that the Wisconsin Delegate Selection Plan did not comply with the Party Rules and the Call because participation in the April 1, 1980 Wisconsin presidential preference primary is not restricted to Democratic voters who publicly declare their party preference and have that preference publicly recorded and because the State Party had not adopted and implemented an alternative delegate selection system.

The record does not disclose the present status of the State Party plan with the Compliance Review Commission or the Credentials Committee. However, the State Party, the National Party and the Wisconsin legislature have set forth their positions: the State Party's administrative committee has resolved to "send a delegation to the 1980 National Convention in New York City selected in accordance with the results of the April 1, 1980 Wisconsin Presidential Preference Primary and chosen pursuant to rules and regulations issued by the Democratic National Committee and the Compliance Review Commission, except those rules and regulations which violate

---

[11] At a hearing before the Compliance Review Commission on June 7, 1979, the State Party urged that the words "in the delegate selection process" in Rule 2A be interpreted as applicable to the actual process of selecting individuals to be delegates to the national convention and not applicable to a preference vote. The Commission refused to adopt this interpretation. Transcript of Hearing before Democratic National Committee Compliance Review Commission—1980, June 7, 1979. Exhibit 15, at 10-12, 19-20.

Wisconsin state law."[12] The National Party asserts that "a Wisconsin delegation which is apportioned to candidates on the basis of the results of the Wisconsin Open Primary will not be seated. The only Wisconsin delegation which will be seated is one which complies with all of the National Party's Rules including Rule 2A."[13] And the Wisconsin legislature has recently affirmed its commitment to maintaining Wisconsin's open primary law.[14]

The sole source of conflict between the Wisconsin statutes and the Party Rules is that Wisconsin permits voters to participate in the presidential preference primary without publicly declaring party preference and having that preference publicly recorded. But for this feature of Wisconsin law there would be no dispute. There is no dispute as to who chooses convention delegates; the State Party does. There is no dispute as to whether the State Party may limit the delegate selection process to Democrats only; the State Party may and it does. There is no dispute whether delegates are bound by law to particular candidates; they are. The dispute centers on who may vote for presidential candidates in a primary.

Before we discuss the legal issues presented by this conflict, we will briefly discuss the historical background of the presidential preference primary. The conflict between state statutes and Party Rules arises because the primary serves both a Party and state function in the

[12] Excerpt from Minutes of Meeting of Administrative Committee of Democratic Party of Wisconsin, September 29, 1979, Exhibit 18.

[13] Stipulation of facts, par. 17.

[14] An Enrolled Joint Resolution was adopted by the Wisconsin State Legislature on September 5, 1979, which reaffirmed "the firm and enduring commitment of the people of Wisconsin to the open presidential preference primary law as an integral element of Wisconsin's proud tradition of direct and effective participatory democracy and endors[ed] the actions taken by the attorney general to preserve and enforce the provisions of that law."

process of selecting candidates to represent the Party in the general election.

## II.

From the time they originated in the 1790's until after the Civil War, American political parties were private voluntary associations which developed outside the government structure and without direct authorization in the federal or state constitution. In *Elrod v. Burns*, 427 U.S. 347, 369 n. 22 (1976), the United States Supreme Court noted that "[p]artisan politics bears the imprimatur only of tradition, not the Constitution."

During the country's early history, the party's candidates were generally chosen by party members in caucuses or conventions which were regulated by the party. The voters either prepared their own ballots for the general election or cast ballots prepared by a political party. The state established the time and place for the elections and established the qualifications for voting at the general election.

State regulation of political parties began for the most part in the 1890's and early 1900's when the states adopted the Australian ballot for the general election. Thereafter the ballot was printed, distributed and counted entirely by public authorities and had the name of the candidate with the partisan affiliation printed next to the name. The ballot was to be marked in secret. When the states began printing ballots, they also devised methods for determining which candidates and which parties should be placed on the ballot.

In the first quarter of the 19th century presidential and vice-presidential candidates were nominated by a congressional caucus from each party. After the decline of the congressional caucus system, and beginning in the

1830's, presidential candidates were nominated by national conventions of state delegates chosen by state party caucuses or conventions.[15]

Robert M. La Follette, Sr., and the Wisconsin progressives were a major force in the 1900's urging legislative adoption of the primary election. The primary was aimed at stimulating popular participation in politics thereby ending boss rule, corruption, and fraudulent practices which were perceived to be part of the party caucus or convention system. Robert M. La Follette, Sr., supported the primary because he believed that citizens should nominate the party candidates; that the citizens, not the party bosses, could control the party by controlling the candidate selection process; and that the candidates and public officials would be more directly responsible to the citizens.[16] Robert M. La Follette, Sr., called for the adoption of the primary, arguing that:

"No longer . . . will there stand between the voter and the official a political machine with a complicated system of caucuses and conventions, by the easy manipulation of which it thwarts the will of the voter and rules official conduct. . . . If the voter is competent to cast his ballot at the general election for the official of his choice, he is equally competent to vote directly at the primary election for the nomination of the candidates of his party. . . ."[17]

[15] Ranney, *Curing the Mischiefs of Faction* 13–15, 78–80 (1975); Ranney & Kendall, *Democracy and the American Party System* 274–277 (1956); Dallinger, *Nominations for Elective Office in the United States* (1897); Goodman, *The Two-Party System in The United States* (3d ed. 1964); Key, *Politics, Parties and Pressure Groups* 687–691 (4th ed. 1958).

[16] Ranney, *Curing the Mischiefs of Faction* 18, 80, 119–122, 124–126 (1975).

[17] Speech Accepting Nomination for Governor, August 8, 1900, in Torelle , *La Follette's Political Philosophy* 36–37 (1920).

Robert M. La Follette and the primary in Wisconsin are discussed in Lovejoy, *La Follette and the Establishment of the Direct Primary in Wisconsin—1890–1904* (1941), and Katz, *The*

Wisconsin adopted an open primary law for partisan offices in 1903 (Laws of 1903, Ch. 451), and the law was amended in 1905 to apply to the selection of national convention delegates (Laws of 1905, Ch. 369). Although the Wisconsin primary law has been modified in several respects, for approximately seventy-five years this state has conducted open primaries for president and for state and local partisan and non-partisan offices.[18]

Beginning in the early 1900's, state legislatures across the country adopted the state-administered primary election for directly or indirectly selecting party candidates.[19] Now approximately 30 states have enacted a presidential primary procedure.[20] The significance of the presidential primaries in selecting the presidential

*Direct Primary and Party Responsibility in Madison* (B.A. Thesis, U.W. 1923).

[18] A brief description of the history of the Wisconsin presidential primary law appears in Wisconsin Legislative Reference Bureau, *The Wisconsin Presidential Primary: Open or Closed?* Research Bulletin 75–RB–1, 5–8 (1975) and Wisconsin Legislative Reference Bureau, *The Selection of a President in the United States, with Particular Reference to Wisconsin* (April 1960).

Robert M. La Follette, Sr., envisioned a closed primary and the early bills in Wisconsin proposed a closed primary law. However, "[t]here is no indication that La Follette was upset about the enactment of an open rather than a closed primary. In his autobiography, he wrote that except for the lack of a provision to allow voters to indicate their second choice on the ballot, 'I think it is the most perfect law for the nomination of candidates by direct vote ever enacted.'" Wisconsin Legislative Reference Bureau, *The Wisconsin Presidential Primary: Open or Closed?* 6–7.

[19] Ranney, *Curing the Mischiefs of Faction* 81, 122–123 (1975); Goodman, *The Two-Party System in the United States* 135–136 (3d ed. 1964).

[20] Wisconsin Legislative Reference Bureau, *The Wisconsin Presidential Primary: Open or Closed?* 11.

candidate is readily apparent; the primary results determine over 70 percent of the convention votes.[21]

Because the primaries are governed by state law, there is considerable variance in the primary process from state to state. In some states voters cast ballots for delegates to national party conventions; in other states voters indicate their preference for presidential candidates. Most state statutes prescribe a "closed primary," that is, participation is restricted to voters who in some manner and at some time prior to voting, publicly declare their affiliation with a political party and have that affiliation recorded. In a few states, including Wisconsin, the legislatures have established an "open primary," that is, the voters are not required to state publicly a party preference. The open and closed primaries are alike in that a voter can vote in the primary of only one party. Goodman, *The Two-Party System in the United States* 128–133 (3d ed. 1964).

Today most states regulate the methods by which political parties select candidates for state and local office and select delegates to the national conventions.[22] The political parties in this country are in the anomalous position of having one of their functions—nomination of their candidates—governed by the state as an integral part of the comprehensive state-regulated election system. The United States Supreme Court has noted:

"[T]he States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state

[21] Ranney, *The Federalization of Presidential Primaries* 2 (1978).

[22] For a description of the state procedures, *see Nomination and Election of the President and Vice-President of the United States—Including the Manner of Selecting Delegates to National Political Convention* (Congress'l Res. Serv., Library of Congress, U.S. Govt. 1976).

elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer v. Brown,* 415 U.S. 724, 729–730 (1974).

This brief summary of the development of the presidential primary demonstrates that both the state and the political parties have been and are deeply involved in the process by which party candidates are selected. Because both the state and the political party function in this process, conflict between the two is inevitable. Goodman, *The Two-Party System in the United States* 128 (3d ed. 1964). Political parties, because of their integral involvement in the election process, are not the typical, purely voluntary association.

### III.

The National Party and its adherents have a constitutionally protected right of political association, but a state law may circumscribe that right. The critical question is whether the circumscription can pass constitutional muster. The answer depends on an analysis of the right claimed, the nature and scope of the limitation and whether there is a sufficient state interest to justify the limitation.[23]

---

[23] There is extensive law review comment on the regulation of elections and political parties, *see, e.g.,* Kester, *Constitutional Restrictions on Political Parties,* 60 Va. L. Rev. 735 (1974); Vining, *Delegate Selection Reform and the Extension of Law into Politics,* 60 Va. L. Rev. 1389 (1974); Raymar, *Judicial Review of Credentials Contests: The Experience of the 1972 Democratic National Convention,* 42 Geo. W.L. Rev. 1 (1973); Skornicka, *State Action in Presidential Candidate Selection,* 1976 Wis. L. Rev. 1269; *Developments in the Law—Elections,* 88 Harv. L. Rev. 1111 (1975); Note, *The Constitutionality of Non-Member Voting in Political Party Primary Elections,* 14 Willamette L.J. 259 (1978); Com-

In *Cousins v. Wigoda*, 419 U.S. 477, 487 (1975), Mr. Justice Brennan, writing for the majority, described the protected rights of the National Party and its adherents as follows:

"The National Democratic Party and its adherents enjoy a constitutionally protected right of political association. 'There can no longer be any doubt that freedom to associate with others for the common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments. . . . The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.' *Kusper v. Pontikes*, 414 U.S. 51, 56–57 (1973). 'And of course this freedom protected against federal encroachment by the First Amendment is entitled under the Fourteenth Amendment to the same protection from infringement by the States.' *Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968). Moreover, '[a]ny interference with the freedom of a party is simultaneous-

ment, *Open Versus Closed Primaries: A Dilemma in the Illinois Election Process*, 1977 So. Ill. U.L. Rev. 210 (1977); Note, *Judicial Intervention in Political Party Disputes: The Political Thicket Reconsidered*, 22 U.C.L.A.L. Rev. 624 (1975); Note, *Primary Elections: The Real Party in Interest*, 27 Rutgers L. Rev. 298 (1974); Note, *Presidential Nominating Conventions: Party Rules, State Law, and the Constitution*, 62 Geo. L.J. 1621 (1974); Note, *Mandates of the National Political Party Clash With Interests of the Individual States as the Party Executes Its Policy By Abolition of State Delegate Selection Results: Legal Issues of the 1972 Democratic Convention and Beyond*, 4 Loyola U.L.J. 136 (1973); Note, *The Right to Vote and Restrictions on Crossover Primaries*, 40 U. Chi. L. Rev. 636 (1973); Note, *Judicial Intervention in the Presidential Candidate Selection Process: One Step Backwards*, 47 N.Y.U.L. Rev. 1184 (1972); Note, *Freedom of Association and the Selection of Delegates to National Political Conventions*, 56 Cornell L. Rev. 148 (1970); Note, *One Man, One Vote and Selection of Delegates to National Nominating Conventions*, 37 U. of Chi. L. Rev. 536 (1970); Note, *Constitutional Safeguards in the Selection of Delegates to Presidential Nominating Conventions*, 78 Yale L.J. 1228 (1969).

ly an interference with the freedom of its adherents.' *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); see *NAACP v. Button*, 371 U.S. 415, 431 (1963)."

Mr. Justice Rehnquist, joined by the Chief Justice and Mr. Justice Stewart, also recognized the constitutionally protected right of freedom of association of members of a political party:

"We agree with the Court that the members of political parties enjoy a constitutionally protected right of freedom of association secured by the First and Fourteenth Amendments to the United States Constitution. The right of members of a political party to gather in a national political convention in order to formulate proposed programs and nominate candidates for political office is at the very heart of the freedom of assembly and association which has been established in earlier cases decided by the Court. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Bates v. Little Rock*, 361 U.S. 516, 523 (1960); *Healy v. James*, 408 U.S. 169 (1972)." *Cousins v. Wigoda*, 419 U.S. 477, 491 (1975).

The National Party describes the right of political association involved in this case as the right to have only Democratic voters participate in selecting the Democratic candidate for President. The National Party asserts that it has prescribed Rule 2A which identifies Democratic voters; that the Wisconsin open primary law conflicts with the Party rule; and that requiring Wisconsin delegates to be apportioned among the presidential candidates according to the results of the Wisconsin presidential preference primary forces the National Party "to accept the votes of non-adherents in choosing its candidates [which] is a direct, severe, and fundamental infringement on First Amendment activity. . . . [R]equiring a political party to permit those who do not share its political values or goals for electoral victory to influence its selection of candidates would

strike at the heart of the political freedom of what is the hallmark of a free and open society."[24]

Although conceding in principle that the state may regulate it in some respects and that its associational rights are subject to limitations, the National Party asserts that this court may not examine the associational objectives of Rule 2A; that this court may not examine the extent to which the state statute actually interferes with the objectives of Rule 2A or with the Party's associational interests; and that this court may not determine whether the Wisconsin open primary law in fact requires the National Party to permit those who do not share its political values to influence its selection of candidates.

We do not adopt the National Party's view which appears to be that only it may determine who may vote on the Democratic ballot in the primary and that the open primary law constitutes a substantial burden on associational rights merely because it conflicts with a National Party Rule. The National Party has the duty

---

[24] Brief of Respondents, Democratic Party of the United States of America and Democratic National Convention, at 17. The brief identifies these "non-adherents" as "Republicans, adherents of other parties, and independents."

The National Party does not assert that it has an interest in acquiring a list of Democratic voters for campaign purposes. The United States District Court for the District of Connecticut in *Nader v. Schaffer,* 417 F. Supp. 837, 848 (D. Conn. 1976), *affd without opinion,* 429 U.S. 989 (1976), said:

"From the party's point of view, enrollment also serves an important housekeeping function. Candidates need to know who is in the electorate, so that they (the candidates) can attempt to persuade those individuals to vote for them. Party members who wish to establish, as party policy, a particular course of conduct through the election of a particular candidate, similarly need to know who their supporters are. It is common experience that direct solicitation of party members—by mail, telephone, or face-to-face contact, and by the candidates themselves or by their active supporters—is part of any primary election campaign. But, without the public list of party members which is provided by the enrollment process, such electioneering would become quite difficult. . . ."

of persuading us that this is a situation in which a state statute significantly infringes the National Party's associational rights. *Marchioro v. Chaney,* 442 U.S. 191, 99 S. Ct. 2243, 2248 (1979). *See also, American Party of Texas v. White,* 415 U.S. 767, 790 (1974). The discussion of substantial burden in this case must focus on whether the open primary law significantly impedes the National Party as it seeks to achieve its stated purposes and objectives.

For the purposes of determining whether the Party's associational rights have been burdened, we accept the National Party's assertion that it has a protected associational interest in ensuring that only Democratic voters participate in selecting the Democratic presidential candidate.[25] We recognize that the primary is a step in the process of selecting a candidate who will be the Party's standard bearer; that the primary is a substitute for closed slate-making by party leaders; and that although the primary broadens participation in slate-making, the primary election remains to some extent a party function.

The National Party asserts that selecting the candidate for its ticket is its business, that it is in the general election, not in the primary, that candidates of all parties seek votes from the entire electorate and that the entire electorate enjoys the freedom to vote for the party's nominees. We must keep in mind, however, that the primary cannot be viewed simply as an election process of a private association. The primary serves an important public function. The primary involved in this case is part of the electoral process for electing the President of the United States. Thus both the state and the party have an interest in protecting the integrity of the

[25] *See* note 41 *infra.*

primary. The party is interested in protecting the integrity of the primary as a party function and protecting its associational interests "from intrusion by those with adverse political principles." *Ray v. Blair,* 343 U.S. 214, 221–22 (1952). The state has a legitimate interest in protecting the overall integrity of the candidate selection process, the primary and the electoral process. This interest includes protecting the associational rights of the party; protecting the rights of its citizens to vote, to associate for political purposes, and not to disclose their party preference; and ensuring that the primary itself and political party participation therein are conducted in a fair and orderly manner.

The National Party in its brief repeatedly asserts that the Wisconsin primary significantly infringes on its associational rights by allowing "Republicans, adherents of other parties, and independents" to vote on the Democratic party ballot. By implication the Party is saying that it does not want these people to participate because they do not have a commonality of interest with Democratic voters and that these people are excluded from participation under Rule 2A, which defines Democratic voters as those persons "who publicly declare their party preference Democratic and have that preference publicly recorded."

Under Rule 2A voters are Democratic voters if they think they are and they say they are. The National Party does not set forth any objective standards against which a voter may test his or her self-designation or against which anyone else may test the voter's designation. Nor does the National Party set forth any subjective standards to guide voters in determining their party preference. We could find no explanation by the National Party of who is a Democratic voter for purposes of voting in the primary except that a Democratic voter is a person who makes a declaration of Democratic party

preference at the time of voting. We could find no explanation of what the declaration is supposed to signify or of what the voters are committing themselves to in making this declaration.

Defining who is and who is not a Republican or Democrat, defining the commonality of interest which binds Democrats or Republicans, or defining the Republican's or Democrat's commitment to the party are key issues which have not, as far as we can tell, been resolved by the parties.[26] The significance of the declaration of preference is far from clear. There are indications that in closed primary states eligible voters do not participate in primaries because they do not understand the "party identification" requirements.[27]

The National Party intended to make it easy for people to be Democratic voters and to participate in selecting the Democratic candidate. The documents relating to the National Party's reform efforts state that a guiding principle is that "opportunity to participate in the delegate

---

[26] In a discussion of state parties and the presidential primaries, a Commission of the National Party recognized that there are various definitions of party and party membership. Possible definitions discussed included: "identifiers in the electorate" and "the on-going organization of political activists who consistently work for the party." Report of the Commission on Presidential Nomination and Party Structure (Winograd, Commission Report), *Openness, Participation and Party Building: Reforms for a Stronger Democratic Party* 25–26 (1978).

Ranney describes four American conceptions of party membership: Party regulars, Candidate and Issue Enthusiasts, Self-designated Adherents, Any and All Voters. Ranney, *Curing the Mischiefs of Faction* 150–170.

Different definitions of who is a Democrat or a Republican have been proposed depending on the stage in the electoral process and the level of involvement, such as primary election, general election, caucus, convention, apportionment of delegates to each state by the national parties, and candidacy.

[27] *Developments—Election Law*, 88 Har. L. Rev. 1111, 1165 (1975).

selection process must be open to all persons who wish to be Democrats and who are not already members of another political party."[28] The Party Rules (Rule 2D) encourage state parties to take all feasible steps to encourage non-affiliated and new voters to register or enroll as Democrats and to provide simple, easy procedures through which they may do so.

On June 23, 1975, Wisconsin Governor Patrick J. Lucey, a Democrat, proposed an amendment to the open primary law which apparently encompassed his interpretation of Rule 2A in the 1976 Convention. The Governor's proposal for the declaration of preference provided:

"Each elector wishing to cast a ballot in the presidential preference vote shall be required to sign a statement in the following form:

" 'For the purposes of voting in the (*year*) Wisconsin presidential preference vote, I hereby state my party preference to be (*Democratic*) (*Republican*) (*American*). It is understood that my party preference does not necessarily indicate an affiliation with or membership in the party, but only a preference for voting purposes in this particular election.' "[29]

It appears reasonable to interpret the voter's declaration of Democratic party preference under Rule 2A as equivalent to the voter stating that at the time of voting in the presidential primary the voter is not an adherent of or loyal to a political party other than the Democratic party and that at the time of voting in the presidential primary the voter prefers the Democratic party and supports it because the party presents candidates, issues, or

---

[28] *Mandate for Reform: A Report of the Commission on Party Structure and Delegate Selection to the Democratic National Committee* (1970), Guideline C–3, at 47.

[29] Public hearing before Assembly Committee on Elections on June 23, 1975, quoted in Wisconsin Legislative Reference Bureau, *The Wisconsin Presidential Primary: Open or Closed?* 4.

philosophies with which the voter identifies.[30] This statement of the commonality of interest of those voting on the Democratic Party ballot is consistent with the principles of the Party's reform effort.

The United States Supreme Court has described the associational interests of voters in a partisan primary as follows:

". . . Under our political system, a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections. A prime objective of most voters in associating themselves with a particular party must surely be to gain a voice in that selection process. By preventing the appellee from participating at all in Democratic primary elections during the statutory period, the Illinois statute deprived her of any voice in choosing the party's candidates, and thus substantially abridged her ability to associate effectively with the *party of her choice.*" *Kusper v. Pontikes,* 414 U.S. at 58. (Emphasis supplied)[31]

Justice Powell similarly viewed the community of interests of voters in a primary election:

"Political parties in this country traditionally have been characterized by a fluidity and overlap of philosophy and membership. And citizens generally declare or alter party affiliation for reasons quite unconnected with any premeditated intention to disrupt or frustrate the plans of a party with which they are not in sympathy. Citizens customarily choose a party and vote in its primary simply because it presents candidates and issues more re-

[30] *See also, Developments—Election Law,* 88 Harv. L. Rev. 1111, 1167 (1975): "What the party members generally share—what their affiliation declaration symbolizes—is a present intention to support party nominees at the general election and in succeeding elections, and a commitment to the party as an ongoing body and to the party's basic political beliefs."

[31] Note the language in sec. 8.12(1), Stats., which provides that the voters express their preference for the person to be the candidate "of their party."

sponsive to their immediate concerns and aspirations. . . . That a citizen should be absolutely precluded so far in advance from voting in a party primary in response to a sympathetic candidate, a new or meaningful issue, or changing party philosophies in his State, runs contrary to the fundamental rights of personal choice and expression which voting in this country was designed to serve." *Rosario v. Rockefeller,* 410 U.S. 752, 769, 770 (1973) (J. Powell dissenting).

The Wisconsin presidential preference primary law protects the same commonality of interest of primary election voters as does Rule 2A. The Wisconsin legislature has established the presidential preference primary to provide the opportunity for "the voters of this state . . . to express their preference for the person to be the presidential candidate *of their party."* Sec. 8.12(1), Stats. Although the statute does not require a public declaration of party preference, the legislative intent is clear that the voters should vote only on the ballot of the party they claim as theirs and that they will not vote on the ballot of a party with which they do not identify. Indeed, the legislature has taken steps to encourage voters to participate in the primary of their party and to discourage a voter of one party from being tempted to vote in the primary of another party. Limiting voters to only one party's ballot discourages voters from voting on a ballot of a party other than their own, because in order to do so they would have to sacrifice their opportunity to participate in their own party's selection process. The presidential preference primary ballot lists the candidates and also includes space for a write-in vote and for a vote against all the candidates offered by that party. When voters mark the ballot "None of the names shown" they are expressing a preference for an uninstructed delegation. Sec. 5.60(8) (intro.), (a), 10.02 (3)(b) 3, Stats. This latter provision was inserted by the legislature "in order to reduce the temptation of

cross-over voting." Ch. 90, Laws of 1967, Analysis by the Legislative Reference Bureau, par. 3.

Thus it appears that the National Party and the Wisconsin legislature have similarly identified those who may vote on the Democratic Party ballot.

Under both the Party ·Rule and the Wisconsin statute the voters designate themselves as Democratic voters using subjective standards; the designation cannot be challenged. Those who seek to vote in the Democratic Party primary will do so because they identify with the commonality of interests which they perceive they share with the party. Under both the Party Rule and the statute the voters associate with the party presenting "candidates and issues more responsive to their immediate concerns." *Rosario v. Rockefeller,* 410 U.S. 752, 769 (1973) (Powell, J. dissenting).

Because under both the Party Rule and the Wisconsin statutes only those voters whose party preference in that primary is Democratic are expected to vote on the Democratic Party ballot, the question then becomes whether Wisconsin's failure to require the public-recorded declaration of Democratic Party preference has a significantly different effect than Rule 2A on excluding "Republicans, independents and others" from voting in the primary.

The National Party's contention that a contemporaneous publicly recorded statement of party preference is necessary to maintain the integrity of associational rights is attenuated by its dependence on two unsupported assumptions: first, that voters who do not have a commonality of interest with the Party will attempt to vote on the Party ballot in sufficient numbers to jeopardize the primary's integrity; and second, that a contemporaneous declaration of party preference is a necessary and effective way of preventing this result.

There are three categories of voters identified by the National Party as not having a commonality of interest

with it. One category consists of the raiders. "Raiding" has been defined by the United States Supreme Court as "the practice whereby voters in sympathy with one party vote in another's primary in order to distort that party's results." *Kusper v. Pontikes,* 414 U.S. 51, 59 (1973). Raiding is an act hostile to the party; it amounts to a fraud on the party. It deprives the party and its members of the purpose of their association. The petitioner and respondents agree that raiding is not a significant problem and that neither the Wisconsin open primary nor the declaration required by Rule 2A prevents "raiding."[32] Rule 2A is not designed to inhibit raiding.[33]

A second category of voters whom the National Party views as not having a commonality of interest with it is Republicans or adherents of other parties. Apparently the National Party adopted Rule 2A to prevent Republicans from voting on the Democratic Party ballot. Political science research studies which the National Party cites indicate that Wisconsin Republicans voted on the 1968 Democratic Wisconsin primary ballot. They

---

[32] Raiding is not a serious threat. *See* materials cited in Note, *The Constitutionality of Non-Member Voting in Political Primary Elections,* 14 Willamette L.J. 259, 282–286 (1978); Adamany, *Communication: Cross-Over Voting and the Democratic Party's Reform Rules,* 70 Am. Pol. Sci. Rev. 536, 538 (1976); Ranney, *Turnout and Representation in Presidential Primary Elections,* 66 Am. Pol. Sci. Rev. 35–36 (1972); Note, *Primary Elections: The Real Party in Interest,* 27 Rutgers L. Rev. 298, 307 n. 74 (1974); *Developments in the Law—Elections,* 88 Harv. L. Rev. 1111, 1172–1173 (1975); Note, *Constitutional Issues in Durational Party Affiliation Requirements,* 25 Maine L. Rev. 147, 154 (1973).

In *State ex rel. Van Alstine v. Frear,* 142 Wis. 320, 342, 125 N.W. 961 (1910), this court commented on raiding as follows: "That any considerable following of one political creed will deliberately desert their own party at the primary to foist an unworthy set of candidates on a rival party presupposes a degree of moral turpitude that we cannot presume to exist."

[33] Winograd Commission Report 68.

were not hostile; they were not attempting to harm the Democratic Party. They:

"deserted their party to register their special approval of a candidate, or a policy associated with a candidate, available only in the other party. [Eugene] McCarthy's Republican supporters clearly did not vote for him because they thought he would be the easiest Democrat for Nixon to beat in November; they did so because they liked him and his opposition to the Vietnam war."[34]

Studies of the Wisconsin open primary indicate that a small percentage of the total primary voters were persons who chose to vote in the other party's primary.[35] Although studies of Wisconsin primaries demonstrate that the statewide result of the primary election has not been affected by Republican cross-over voting, the National Party was concerned that the Wisconsin open primary law might enhance the possibility that a Democratic candidate might be chosen by Republicans who "have different candidate preferences from the Democratic Party identifiers in the electorate."[36]

Significantly, the studies relied upon by the National Party show that primary voters nationwide are not representative of rank and file Democrats.[37] Primary voters tend to be people with higher socio-economic and educational backgrounds than rank and file Democrats. The National Party report concluded that on a national basis "demographically, the 1976 [primary] electorate is as unrepresentative of Democratic Party identifiers as previous primary electorates."[38] As to causes limited

---

[34] *Id.*, quoting from Ranney, *Turnout and Representation in Presidential Primary Elections*, 66 Am. Pol. Sci. Rev. 35 (1972).

[35] Hedlund, *Cross-Over Voting in a 1979 Open Presidential Primary*, 41 Pub. Op. Q. 498, 502, 513 (1977–78).

[36] Winograd Commission Report 68, referring to Adamany, *Communication: Cross-Over Voting and The Democratic Party's Reform Rules*, 70 Am. Pol. Sci. Rev. 536 (1976). *See also*, Hedlund, *Cross-Over Voting in a 1976 Open Presidential Primary*, 41 Pub. Op. Q. 498, 502–503 (1977–78).

[37] Winograd Commission Report 10–15.

to "Democrats only," which the National Party permits in lieu of primaries, the National Party concluded that caucuses were similar to primaries in that "rank and file participation in the nominating process has invariably been demographically unrepresentative of the Democratic rank and file."[39] The National Party's own materials indicate that Wisconsin's open primary produces an electorate which is as representative (or as unrepresentative) of "Democratic identifiers in the electorate" as is the electorate produced by closed primaries and caucuses which are acceptable to the National Party.[40]

The National Party's brief identified "independents" as a third category of voters who do not have a commonality of interest with the party.[41] The party materials submitted on Rule 2A do not refer to the need to screen out participation by independents. The declaration of preference required by Rule 2A appears to be no more effective than the open primary in deterring the partici-

---

[38] *Id.*, 14.

[39] *Id.*, 15. In addition, the Winograd Commission found that:

"Data on caucus participants show that there are far fewer caucus participants that primary voters. In 1976, some 3.9% of the eligible persons participated in the caucus system; this was less than one-tenth the participation rate of the primaries." *Id.*

[40] Winograd Commission Report 10–14.

[41] The United States Supreme Court, in reviewing the validity of limitations on voting rights in primary elections, has considered the state interest to be that of preserving the integrity of the election by protecting the party against raiders (hostile voters). *Rosario v. Rockefeller*, 410 U.S. 752 (1973), *reh. denied*, 411 U.S. 959 (1973); *Kusper v. Pontikes*, 414 U.S. 51 (1973).

The United States Supreme Court has not considered the constitutionality of a state statute which permits persons who designate themselves as independents to vote on a party's ballot in a primary.

In *Nader v. Schaffer*, 417 F. Supp. 837 (D. Conn. 1976), *aff'd without opinion*, 429 U.S. 989 (1976), the court concluded that the

pation of independent voters. Studies suggest that in closed primary systems, voters who consider themselves independents enroll or register as party members to vote in the primary of their choice.[42]

As is evident from the discussion, we have not been presented with any factual basis to support the National Party's position that under the open primary statute, "Republicans, adherents of other parties, and independents would significantly affect the selection of the Democratic candidates."

Nor has the Party shown that the contemporaneous declaration of party preference is a necessary and effective way to prevent Republicans, adherents of other parties, and independents from voting on the Democratic Party ballot. Although some political theorists tend to support requiring a declaration of party affiliation to vote in a primary,[43] it is generally recognized that in the real world in which elections are conducted the closed

state's interest in protecting the integrity of the election justified the exclusion of "independents" from voting in a primary. Independents were defined as persons interested in and affected by the primary election but not willing to enroll as party members in accordance with the statutes.

[42] Note, *The Constitutionality of Non-Member Voting in Political Party Primary Elections*, 14 Willamette L.J. 259, 277, n. 103, 288; Hedlund, *Cross-Over Voting in a 1976 Open Presidential Primary*, 41 Pub. Op. Q. 498, 501, 504 (1977–78).

[43] In 1950 the Committee on Political Parties of the American Political Science Association expressed a preference for the closed over the open primary on the ground that the closed arrangement "tends to support the concept of the party as an association of like-minded people." Key, *Politics, Parties and Pressure Groups* 431 (4th ed. 1958).

For a discussion of the question whether primaries weaken the parties, *see* Austin Ranney, Richard G. Stearns & David A. Keene, N.Y. Times, Sun. Dec. 2, 1979, Section E 4, 5; Ranney, *Curing the Mischiefs of Faction* 121–131; Scott & Hrebenar, *Parties in Crisis* 127–131 (1979); Sorauf, *Political Parties in the American System* 101 (1964); Schattschneider, *Party Government* 53–61 (1942).

primary works in substantially the same way as the open primary:

> "[T]he essence of the legal definitions of party membership in the United States will surely continue to be *self-designation*. The fact remains that today even in Illinois, New York, or any other closed-primary state you are a Democrat if you say you are; no one can effectively say you are not; and you can become a Republican ·any time the spirit moves you simply by saying that you have become one. You accept no obligations by such a declaration; you receive only a privilege—the privilege of taking an equal part in the making of the party's most important decision, the nomination of its candidates for public office. The only remaining restriction is that in some states, such as California, you may have to let the registrar of voters know that you have changed parties, and you may have to do so several weeks or even months before your new party's next primary. But in many closed-primary states you do not even have to do that, and in Wisconsin and other open-primary states you are not *allowed* to make an official declaration of your party membership. One can only conclude that the so-called 'closed' primaries are just a hair more closed than the so-called 'open' primaries." Ranney, *Curing the Mischiefs of Faction* 166–167 (1975).

Both the closed and open primary depend on the honesty and integrity of the voters and the voters' understanding of the nature of the party system and the function of the primary.[44]

The significant difference between the open and closed primary is that voters "resent being prohibited from voting if they refuse to make a party declaration and having their affiliation a matter of public record for fear of losing their jobs or risking other penalties."[45] The significant difference between the Wisconsin open primary and a primary conducted under Rule 2A is not that the

[44] Ranney & Kendall, *Democracy and the American Party System* 207–208.

[45] Goodman, *The Two-Party System in the United States* 131.

open primary permits significant numbers of "Republicans, independents and others" to vote on the Democratic ballot but that the open primary permits more people to vote on the ballot of their party by allowing a private declaration of party preference. Voters who prefer the Democratic Party in that primary, but who do not understand the significance of publicly declaring their Democratic Party preference or who think they are barred because they are not dues-paying party members or who are unwilling publicly to declare and record a party preference because of fear of undue pressure or harassment from employers, business associates, social acquaintances or party members, may be prevented from voting under Rule 2A but are able to vote under the open primary law.

We therefore conclude that the Wisconsin open primary law does not impose a substantial burden on the associational rights of the party. Indeed any burden appears speculative, remote and minimal.

## IV.

Although we conclude that any infringement on the right to associate is minimal, we turn to a discussion of the state interest in maintaining an open primary.

A state law can substantially affect the associational freedoms of a political party. The general rule is, however, that such a law may withstand constitutional scrutiny only upon a clear showing that the burden imposed is necessary to protect a compelling and substantial government interest, *Dunn v. Blumstein*, 405 U.S. 330, 342, 343 (1972),[46] and that the state "employs means closely

---

[46] Various tests have been used to describe the state interest which will justify interference with the freedom of political association: "legitimate" *Rosario v. Rockefeller*, 410 U.S. 752, 761–762 (1973); "important" *Jenness v. Fortson*, 403 U.S. 431, 442

drawn to avoid unnecessary abridgment of associational freedoms," *Buckley v. Valeo,* 424 U.S. 1, 25 (1976). The United States Supreme Court has said that this rule does not invalidate "every substantial restriction on the right to vote or to associate. Nor could this be the case under our Constitution where the States are given the initial task of determining the qualifications of voters." *Storer v. Brown,* 415 U.S. 724, 729 (1973).

## A.

The state's interest in maintaining a primary and in not restricting voting in the presidential preference primary to those who publicly declare and record their party preference is to preserve the overall integrity of the electoral process by encouraging increased voter participation in the political process and by providing secrecy of the ballot, thereby ensuring that the primary itself and the political party's participation in the primary are conducted in a fair and orderly manner.

In guaranteeing a private primary ballot, the open primary law serves an interest fundamental to a democracy—the critical interest of privacy of political preferences and convictions. This interest is "fundamental in a free society," and the advent of the secret ballot is "one of the great political reforms." *Buckley v. Valeo,* 424 U.S. 1, 237 (1976) (Burger, C.J., concurring).

In guaranteeing a private primary ballot, the open primary serves the state interest of encouraging voters to participate in selecting the candidates of their party

(1971); "sufficiently important" *Buckley v. Valeo,* 424 U.S. 1, 25 (1976); "paramount and of vital importance" *Elrod v. Burns,* 427 U.S. 347, 362 (1976); and "compelling" *Cousins v. Wigoda,* 419 U.S. 477, 489 (1975).

which, in turn, fosters democratic government.[47] Historically the primary was initiated in Wisconsin in an effort to enlarge citizen participation in the political process and to remove from the political bosses the process of selecting candidates. This state adopted the open primary in 1903 and has retained it over these many years in the belief that "facilitat[ing] and enlarg[ing] public discussion and participation in the electoral process [are] goals vital to a self-governing people." *Buckley v. Valeo*, 424 U.S. 1, 92–93 (1976). The legislature of this state believes democracy is best served by stimulating political activity.

Requiring a public, recorded declaration of party preference is an unnecessary barrier to voting. Voters who prefer the Democratic Party may be inhibited from voting because they do not understand the significance of the declaration or they think that they are barred because they are not dues-paying Democrats. Most importantly, voters who prefer the Democratic Party may be unwilling to declare and have publicly recorded a party preference because of fear of undue pressure or harassment.[48]

Requiring a public recorded declaration of party preference interferes with the state's entire election system

[47] "Preservation of the democratic process is certainly an interest protection of which may in some instances justify limitations on First Amendment freedoms." *Elrod v. Burns*, 427 U.S. 347, 368 (1976).

[48] In 1902 the most persuasive argument against adopting a closed primary system was that it violated the secrecy of the ballot by forcing the voters to declare publicly their party preference. Protecting the secrecy of the ballot is still a significant argument for retaining the open primary. Wisconsin Legislative Reference Bureau, *The Wisconsin Presidential Primary: Open or Closed?* 7, 13; Ranney & Kendall, *Democracy and the American Party System* 281; Note, *The Constitutionality of Non-Member Voting in Political Party Primary Elections*, 14 Willamette L.J. at 279.

which is based on the secrecy of the ballot and non-disclosure of party preference. The September primary for partisan state officers is similar to the presidential preference vote in that the voter need not make a public declaration of party preference; the voter must vote a straight-party ballot. Secs. 5.62, 10.02(3) 2m, Stats. In the spring election, which coincides with the presidential preference primary once every four years, Wisconsin voters elect hundreds of non-partisan executive, legislative and judicial officers on the state and local level. Secs. 5.60(3) (a), 8.05(3) (a) (d), (4) (a), Stats. Wisconsin has a long and strong tradition of non-partisan elections. Thus in Wisconsin, non-disclosure of the voter's party preference has been an integral facet of the primary process which is an integral facet of the entire electoral process; non-disclosure of party preference extends to choosing presidential party candidates and partisan and nonpartisan state and local candidates and to the election of partisan officers and an extensive array of nonpartisan officers.

Each state legislature should be free, within constitutional limits, to determine the qualifications of voters for the primary and to choose the candidate selection process and the primary election system that best promotes its electoral and governmental goals and best meets its needs. The open primary system has existed in Wisconsin for almost the entire 20th century. It is deeply engrained in the political institutions of the state and political culture of the state. Epstein, *Politics in Wisconsin* (1958). The open primary law has functioned well in the state of Wisconsin for the citizens and for the political parties.

The Wisconsin open primary law is drawn with the "precision" required to pass constitutional tests. The law is "tailored" to serve its legitimate objectives with the least burden on constitutionally protected rights.

*Dunn v. Blumstein*, 405 U.S. 330, 343 (1972). The Wisconsin primary law protects the state's interest in encouraging citizen participation in the political process, the commonality of interest of voters who prefer a political party, the party's associational interests, and also the rights of citizens to vote and to associate for political purposes. The legislature established the primary rather than a caucus or convention; the legislature intends that people vote only in the primary of their party. Recognizing that a private declaration of party preference rather than a public-recorded one might tempt some to cross over, the legislature has taken measures to reduce the temptation and to protect the party's associational interests. We described these statutory techniques previously. In addition the legislature has limited the impact of the presidential preference primary vote to that of apportioning the delegates among the candidates. The presidential primary vote is not used to select delegates.

We conclude that any burden imposed on associational rights by the open primary law is minimal and is justified by Wisconsin's compelling and substantial governmental interests.

### B.

Although the National Party wishes to characterize the presidential primary as a party nominating procedure in which the state has only a peripheral interest, such a characterization is outdated and simplistic. In *Marchioro v. Chaney*, 442 U.S. 191, 99 S. Ct. 2243, 2246, (1979), the United States Supreme Court upheld state regulation of political parties in their "critical role . . . in the process of selecting and electing candidates for state and national office." When we are dealing with the two major political parties in the country, the primary is more than an election within a private club; it is a vital step in the process of electing the President. Indeed in

some elections, the primary may be the critical stage in the election of the President.

The right to vote at the primary is no less important than the right to vote at the general election because the "ultimate choice of the mass of voters is predetermined, when the nominations have been made." *Newberry v. United States*, 256 U.S. 232, 286 (1921) (Pitney, J. dissenting).

The right of citizens to vote in primaries was aptly described by the Court of Appeals in *Lynch v. Torquato*, 343 F.2d 370, 372 (3d Cir. 1965) as follows:

"[T]he citizen's constitutional right to equality as an elector . . . applies to the choice of those who shall be his elected representatives in the conduct of government, not in the internal management of a political party. It is true that this right extends to state regulated and party conducted primaries. However, this is because the function of primaries is to select nominees for governmental office even though, not because, they are party enterprises. The people, when engaged in primary and general elections for the selection of their representatives in their government, may rationally be viewed as the 'state' in action, with the consequence that the organization and regulation of these enterprises must be such as accord each elector equal protection of the laws. In contrast, [is] the normal role of party leaders in conducting internal affairs of their party, other than primary or general elections . . . ."

The courts have frequently recognized the significance of the primary in the totality of the elective procedure. In *Storer v. Brown*, 415 U.S. 724, 735 (1974), the United States Supreme Court, in upholding California's law forbidding a position on the ballot to independent candidates for Congress, stated:

". . . The direct party primary in California is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the

initial stage in a two-stage process by which the people choose their public officers. It functions to winnow out and finally reject all but the chosen candidates."

The critical nexus between the primary and the general election is further illustrated by the *White Primary Cases,* which sought to prevent racial discrimination in primary voting. *See, e.g., Terry v. Adams,* 345 U.S. 461 (1953), *reh. denied,* 345 U.S. 1003 (1953), *Smith v. Allwright,* 321 U.S. 649 (1944), *United States v. Classic,* 313 U.S. 299, 318 (1941), *Nixon v. Condon,* 286 U.S. 73 (1932), and *Nixon v. Herndon,* 273 U.S. 536 (1927).

In *State ex rel. La Follette v. Kohler,* 200 Wis. 518, 559–560, 228 N.W. 895 (1930), this court said:

"[T]he primary is a part of the election. When parties are recognized by the laws of a state and given a status in the law, party activities are thereby drawn within the field of regulation. As a matter of fact, the convention and caucus system and the primary election system are mere extensions of that which was originally included under the title *Elections* [in the Statute books]. Elections are the means by which choices are made by the electors. When the process of choosing begins the election has been begun. Originally so far as the law was concerned it was supposed to begin and end on election day. Then the law extended it by taking notice of caucuses and conventions. Later it substituted the primary for the caucus and convention. While the process has been extended it still is one thing—the making of a choice. This unity is indicated by the fact that the law requires that with a nomination paper there shall be filed by the proposed candidate a declaration that if nominated and elected he will qualify." (Footnotes omitted.)

Once the state provides a primary and makes the vote available to some persons, the right of all persons to vote becomes a basic one under the Constitution. *Rosario v. Rockefeller,* 410 U.S. 752, 764 (1973) (J. Powell dissenting, citing *Dunn v. Blumstein,* 405 U.S. 330 (1972) ;

*Kramer v. Union School District,* 395 U.S. 621 (1969); *Carrington v. Rash,* 380 U.S. 89 (1965)). The United States Supreme Court has protected the voters' right to participate in a primary election from state laws imposing substantial burdens on the franchise. *Rosario v. Rockefeller,* 410 U.S. 752 (1973), *reh. denied,* 411 U.S. 959 (1973); *Kusper v. Pontikes,* 414 U.S. 51 (1973).

The United States Supreme Court has repeatedly emphasized the significance of the right to vote as "a fundamental political right . . . preservative of all rights." *Yick Wo v. Hopkins,* 118 U.S. 356, 370 (1886).

". . . No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964), quoted in *Williams v. Rhodes,* 393 U.S. 23, 31 (1968).

Public participation in the election of government officers is the essence of the American system of representative democracy. It is through elections, including primary elections, that public officials are chosen, that public policy is discussed and that the government is legitimized. The state has a legitimate role in regulating the presidential candidate selection process[49] and has a compelling interest in maintaining an open primary.

[49] The United States Constitution gives the states a significant role in the election of the President of the United States. *Williams v. Rhodes,* 393 U.S. 23, 29 (1968); *Cousins v. Wigoda,* 419 U.S. 477, 495 (1975) (Rehnquist, J. concurring opinion). The ultimate power to elect the President of the United States is in the Electoral College composed of electors chosen by the state legislatures. Art. II, sec. 1, of the United States Constitution provides:

"Each state shall appoint, in such manner as the legislature thereof may direct, a number of electors [to elect a president and vice-president]."

## C.

The National Party, citing *Cousins v. Wigoda,* 419 U.S. 477 (1975), argues that Wisconsin does not have a compelling interest to justify imposing a substantial burden on the Party's associational interest. The United States Supreme Court in *Cousins* held that Illinois' interest in protecting the integrity of its primary electoral process was not a compelling state interest in the context of selection of delegates to the National Party convention.[50]

We have concluded that the Wisconsin open primary does not differ substantially from a primary in which public declaration of party preference is required with regard to permitting non-Democrats to influence the selection of candidates and that therefore the open primary law does not constitute a substantial burden on associational rights. We also conclude that even if the burden were substantial, Wisconsin has a compelling state interest under the *Cousins* case.

The controversy in the *Cousins* case involved two delegations from Chicago competing to be seated at the 1972 Democratic national convention. In Illinois, the local parties select potential delegates prior to the primary, and the voters elect the delegates in the primary. It was alleged that in selecting delegates whose names would

The United States Supreme Court has recognized that the "administration of the electoral process is a matter that the Constitution largely entrusts to the states." *Kusper v. Pontikes,* 414 U.S. 51, 57 (1973).

[50] For a discussion of the *Cousins* case, *see* Note, *Cousins v. Wigoda, Primary Elections, Delegate Selection and the National Political Convention,* 70 N.W. L. Rev. 699 (1976); Case Note, *National Political Party Conventions: State's Interest Subordinate to Party's in Delegate Selection Process,* 29 U. Miami L. Rev. 806 (1975); Rotunda, *Constitutional and Statutory Restrictions on Political Parties in the Wake of Cousins v. Wigoda,* 53 Tex. L. Rev. 935 (1975); Note, *The Supreme Court and the Credentials Challenge Cases: Ask a Political Question, You Get a Political Answer,* 62 Calif. L. Rev. 1344 (1974).

appear on the ballot the local party had violated National Party guidelines governing slate-making procedures; minority, women and youth participation; public notice of party affairs; and timing of delegate selection. In *Cousins*, the local party organization could have obeyed both the National Party guidelines and the Illinois statutes. The guidelines and statutes did not conflict; the statutes were silent on the disputed issue of local-party slate-making; the statutes and the guidelines thus complemented each other. *Brown v. O'Brien*, 469 F.2d 563, 572 (D.C. Cir. 1972).

Because of the violation of its guidelines, the National Party's Credentials Committee recommended that the convention refuse to seat the Wigoda delegation which was duly elected under the state statute and that the convention seat the Cousins delegation. The defects in the selection process of the Wigoda delegation went to the heart of the National Party's reform effort—opening the party to all interested in participating. After the Credentials Committee made its determination, the Illinois appellate court enjoined the Cousins delegates (whom the Credentials Committee supported) from acting as delegates to the Convention. The Cousins delegates contended that "the injunction constituted an unconstitutional 'significant interference' with protected rights of political association." *Cousins*, 419 U. S. at 488.

The Illinois court identified the state interest as protecting the "votes cast at the primary from the impairment that would result from stripping the [Wigoda delegates] of their elected-delegate status."

The United States Supreme Court identified the issue in *Cousins* as:

"... whether the [Illinois] Appellate Court was correct in according primacy to state law over the National Political Party's rules in the determination of the quali-

fications and eligibility of delegates to the Party's National Convention," (419 U.S. at 483)

and decided that the Illinois Appellate Court was wrong in deciding that:

"[t]he right to sit as a delegate representing Illinois at the national nominating convention is governed exclusively by the Illinois Election Code . . . .
" . . .
"[T]he law of the state is supreme and party rules to the contrary are of no effect. . . .
"The interest of the state in protecting the effective right to participate in primaries is superior to whatever other interests the party itself might wish to protect. . . ." 14 Ill. App.3d 460, 472, 475, 302 N.E.2d 614 (1973) ; quoted in *Cousins,* 419 U.S. at 481–482.

The United States Supreme Court concluded in *Cousins* that the state's interest in protecting delegates elected under its electoral system was not in and of itself a sufficient justification to sustain a significant interference with the delegates' (and party's) associational interests.

The present case is distinguishable from *Cousins.* In *Cousins* the Party Rules and state statutes were complementary; no Illinois statutory provision conflicted with a party rule. Illinois' sole interest was to protect the result of its primary. In the case at bar Wisconsin statutes directly conflict with a Party Rule. Unlike *Cousins,* the State Party cannot comply with both the statute and the National Party Rules. Unlike Illinois, Wisconsin's interest is not merely to protect the results of the primary. Wisconsin has a compelling state interest in maintaining the special feature of its electoral law—a primary which permits private declaration of party preference.

The Attorney General and the State Party are not asserting, as was asserted in *Cousins,* that state law always prevails over a party rule without need to balance

the interests of the state against the associational rights of the Party. They are not arguing that the National Party must seat any delegates selected by the State Party in accordance with Wisconsin law. They urge the court to hold that the National Party cannot refuse to seat the Wisconsin delegation on the sole ground that the delegation was apportioned by utilizing the results of a primary in which no public declaration of party preference was required.

While the language of the majority opinion is couched in broad terms, we do not believe that *Cousins* stands for the proposition that every state law affecting delegates to a national convention and conflicting with a National Party Rule is automatically invalid and unenforceable. In cases subsequent to *Cousins,* the United States Supreme Court has not cited *Cousins* for this broad proposition. The Court has recognized the state's interest in regulating the role played by political parties in the process of selecting candidates for national office.

In *Marchioro v. Chaney,* 442 U.S. 191, 99 S. Ct. 2243, 2246 (1979), the United States Supreme Court upheld a state law which directed political parties to create central committees and granted these statutorily created committees certain functions. The Court said:

"The requirement that political parties form central or county committees composed of specified representatives from each district is common in the laws of the States. These laws are part of broader election regulations that recognize the critical role played by political parties in the process of selecting and electing candidates for state and national office. The State's interest in ensuring that this process is conducted in a fair and orderly fashion is unquestionably legitimate; 'as a practical matter there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' *Storer v. Brown,* 415 U.S. 724, 730. That interest is served by a state statute requiring that

a representative central committee be established, and entrusting that committee with authority to perform limited functions, such as filling vacancies on the Party ticket, providing for the nomination of presidential electors and delegates to national conventions and calling statewide conventions. Such functions are directly related to the orderly participation of the political party in the electoral process."

The Court commented on the scope of *Cousins* in *Marchioro* as follows:

"*Cousins v. Wigoda,* 419 U.S. 477, upon which appellants place their primary reliance, does not support their claim here. In *Cousins,* unlike this case, there was a substantial burden on associational freedoms. This fact alone distinguishes the two cases, and renders *Cousins* inapposite." 442 U.S. 191, 99 S. Ct. at 2248, n. 15.

Similarly in *Buckley v. Valeo,* 424 U.S. 1, 24, 25 (1976), the United States Supreme Court, in upholding certain aspects of the federal election law, cited *Cousins* for the proposition that states may interfere with the right of political association if the state's interest is sufficiently important:

"[T]he primary First Amendment problem raised by the Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association. The Court's decisions involving associational freedoms establish that the right of association is a 'basic constitutional freedom,' *Kusper v. Pontikes,* 414 U.S., at 57, that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.' *Shelton v. Tucker,* 364 U.S. 479, 486 (1960). See, *e.g., Bates v. Little Rock,* 361 U.S. 516, 522–523 (1960); *NAACP v. Alabama, supra,* at 460–61; *NAACP v. Button, supra,* at 452 (Harlan, J., dissenting). In view of the fundamental nature of the right to associate, governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.' *NAACP v. Alabama, supra,* at 460–461. Yet,

it is clear that '[n]either the right to associate nor the right to participate in political activities is absolute.' *CSC v. Letter Carriers,* 413 U.S. 548, 567 (1973). Even a ' "significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms. *Cousins v. Wigoda, supra,* at 488; *NAACP v. Button, supra,* at 438; *Shelton v. Tucker, supra,* at 488." 424 U.S. at 24–25.

Judge Frankel in *Fallon v. State Board of Elections of the State of New York,* 408 F. Supp. 636, 638 (S.D.N.Y. 1976), reads *Cousins* similarly:

". . . Read most liberally . . . *Cousins, supra,* held no more than that the policy of a national political party in setting qualifications for delegates to its convention may, in some circumstances, prevail over contrary state law.[3]"

". . .

"[3]A fairer reading of *Cousins* probably does not go even this far. There, a state court enjoined the plaintiff-delegates who were not elected in the state primary from being seated at the 1972 National Democratic Convention after the Credentials Committee had refused to seat those delegates who were elected in the primary on the ground that certain slate-making procedures required by the Party's charter were not complied with. The plaintiffs appealed to the Supreme Court and took their seats in violation of the injunction. While contempt proceedings were pending, the Supreme Court reversed the state injunction, holding that it violated plaintiffs' right of freedom of political association. As Justice Rehnquist pointed out in his concurring opinion, the operation of the state injunction 'was as direct and severe an infringement of the right of association as can be conceived.' 419 U.S. at 491–92. Whether the *Cousins* decision can thus be read to hold that any national party rule overrules a contrary state election requirement is at best questionable."

The Wisconsin open primary law regulates the qualifications of voters and the manner of casting ballots for a

presidential candidate; it does not govern the selection of or qualification of delegates to the national convention. The results of the presidential preference primary are used by the State Party for the limited purpose of apportioning delegate votes among the various Democratic candidates for President. The National Party does not object to the fact that the delegates' votes are bound for a limited period.

Historically the states created the primary and have regulated the qualifications for voting in the primary and the manner in which the ballot was cast. Allowing Wisconsin to maintain an open primary does not allow " 'each of the fifty states [to] establish the qualifications of its delegates to the various party conventions without regard to party policy, an obviously intolerable result.' . . . [which] could seriously undercut or indeed destroy the effectiveness of the National Party Convention as a concerted enterprise engaged in the vital process of choosing Presidential and Vice-Presidential candidates—a process which usually involves coalitions cutting across state lines." *Cousins v. Wigoda,* 419 U.S. at 490.

This case does not arise "in the context of the selection of delegates to the National Party Convention" or in the context of determining " 'intra-party disputes as to which delegates [should] be seated.' " *Cousins v. Wigoda,* 419 U.S. at 491. In this case, the state law does not impose a substantial burden on the National Party's right of association, and Wisconsin has a compelling interest in maintaining the special feature of its electoral law. *Cousins* is inapposite.

*By the Court.*—It is adjudged and declared that the Wisconsin electoral statutes involved in this controversy are constitutional, in full force and effect and binding on the petitioner and respondents; that the presidential preference primary shall be conducted in accordance with the Wisconsin statutes; and that Wisconsin delegates to

the Democratic Party national convention shall be apportioned as required by statute in accordance with the results of the presidential preference vote and are not disqualified as delegates solely by reason of the apportionment being determined as required by the Wisconsin statutes.

Appendix to Opinion of the Court.

**5.02  Definitions.**   In Title II, unless the context requires otherwise:

**(1)**  "Board" means the elections board.

. . .

**(13)**  "Political party" or "party" means a state committee registered under s. 11.05 organized exclusively for political purposes, recognized by the national organization of the party, if any, under whose name candidates appear on a ballot at any election, and all county, congressional, legislative, local and other affiliated committees authorized to operate under the same name, except that the term does not include committees organized under s. 8.17 and assigned responsibilities under s. 7.30, with respect to such activities only.

. . .

**(21)**  "Spring election" means the election held on the first Tuesday in April to elect judicial, educational and municipal officers, non-partisan county officers and to express preferences for the person to be the presidential candidate for each party.

**5.37  Voting machine requirements.**   (1) Voting machines shall give every elector a reasonable opportunity to vote for any person for any office and on any proposition he is entitled to vote on, assure privacy to the elector so no one will know how he is voting or has voted, preclude the electors from voting for persons or propositions upon which they are not entitled to vote and from voting more than once for the same office or on the same proposition.  Voting machines shall be constructed to

lock so they cannot be manipulated, tampered with, or show the number of votes registered for any candidate or proposition while voting is in progress. The machines shall provide a method for electors to vote a straight party ticket, shall permit voting a split ticket and shall record each vote cast.

(2) When 2 or more wards or aldermanic districts are joined to use a voting machine, under s. 5.15 (6) (b), the machine shall be constructed to allow the electors to vote for all nominated candidates and issues for their aldermanic district or ward, but for no other.

(3) For presidential electors one device may be provided to vote for all of one party's electoral candidates at the same time. The device shall be opposite or adjacent to the ballot containing the names of the party's candidates for president and vice president.

(4) Voting machines may be used at primary elections when they comply with subs. (1) and (2) and the following provisions: All candidate's names entitled to appear on the ballots at the primary shall appear on the machine; the elector cannot vote for candidates of more than one party, whenever the restriction applies, and an elector who votes for candidates of any party may not vote for independent candidates at the September primary; the elector may secretly select the party for which he or she wishes to vote, or the independent candidates in the case of the September primary; the elector may vote for as many candidates for each office as he or she is lawfully entitled to vote for, but no more.

(5) Polling places may have more than one voting machine.

**5.40  Voting machines shall be used.**   (1) The common council of every city and the trustees of every village with a population of 10,000 or more shall require the use of voting machines. Any other municipal governing body

may adopt and purchase voting machines for use in the various wards.

**(2)** Only voting machines complying with s. 5.37 shall be used in any election in this state.

**(3)** Notwithstanding sub. (1), the use of voting machines shall be optional with the municipality for any territory of low population annexed to a city or village across the boundary of a legislative district, but shall again be mandatory as soon as the best evidence suggests that the population residing in the territory so annexed exceeds the minimum population for a ward as specified under s. 5.15 (2).

**5.60 Spring election ballots.** At spring elections the following ballots, when necessary, shall be provided for each ward.

**(1)** JUDICIARY; STATE SUPERINTENDENT OF PUBLIC INSTRUCTION; COUNTY EXECUTIVE AND COUNTY SUPERVISORS. There shall be one separate ballot for the county executive under ss. 59.031 and 59.032, county supervisors, judicial officers and the state superintendent of public instruction. Arrangement of the county executive and county supervisors within a county shall be arranged by the county clerk, or by the executive secretary of the county election commission under this section.

(a) The names of candidates for the same office shall be placed in the same column. No party designation may appear on the official ballot. A space shall be provided on the ballot for electors to write in the name of a person for each office, regardless of whether there is a primary for that office.

(b) The board shall certify the candidates' names and designate the official ballot arrangement for candidates for justice, court of appeals judge, circuit judge and state superintendent. The arrangement of names of all candidates on the ballot whose nomination papers are filed

with the board shall be determined by the board by the drawing of lots on the day following the deadline for filing nomination papers.

(c) The county clerk or board of election commissioners shall determine the official ballot order for judicial office candidates not determined by the board, using the same method of determining arrangement of names on the ballot as that used by the board under par. (b).

(d) When 2 or more judges of the same court are to be elected, the official ballot shall contain the names of all candidates, shall state the number of judges to be elected and the number of candidates for whom each elector may vote. Each candidacy shall show the branch being filled.

(3) CITY. There shall be a separate ballot giving the names of all candidates for city and school offices, except under sub. (4), printed in substantially the same form as annexed ballot "B." City election ballots may vary in form to conform to the law under which an election is held.

(a) No party designation shall appear on the official ballot.

(b) The city clerk or executive secretary of the city election commission shall arrange the official city ballot under s. 5.62 (4).

(4) CITY SCHOOL. (a) There shall be a separate ballot for city school officers when so required. Officers elected under s. 120.44 (2) (a) may be placed on the same ballot as other city officers.

(b) In cities of the 1st class, there shall be a separate ballot giving the names of the candidates for any combined aldermanic district seat and any at-large member seat to be filled on the board of school directors. The names for the at-large seat shall be placed in the same column.

(5) VILLAGE. There shall be a separate ballot giving the names of all candidates for village offices.

(a) The offices to be filled shall be arranged on the official ballot in the order they are named in the statutes creating them. Where there is more than one ward, candidates shall be arranged by using the same method as that used by the board under sub. (1) (b). Sufficient space shall be left under each office for write-in candidates.

(b) Only persons nominated under s. 8.05 shall be placed on the official ballots. If no nominations are made, the spaces for his office shall be left blank.

(6) TOWN. There shall be a separate ballot giving the names of all candidates for town offices, except the superintendent of highways, in substantially the same form as annexed Ballot 6A or 6B. Ballot 6A is for the election of one supervisor and 6B is for the election of the 2 supervisors jointly. On Ballot 6B all supervisor candidates shall be listed together and the voting instruction shall state "Vote for Two." Towns now electing their supervisors jointly shall continue to do so until the method outlined for Ballot 6A is adopted at the annual town meeting. The names of candidates whose nomination papers are filed at the town level shall be arranged by using the same method as that used by the board under sub. (1) (b).

(7) REFERENDUM BALLOTS. There shall be a separate ballot setting forth all propositions requiring a vote in the form and manner provided by s. 5.64.

(8) BALLOTS FOR PRESIDENTIAL VOTE. There shall be a separate ballot for each party qualified under s. 5.62, listing the names of all potential candidates of that party determined under s. 8.12 and affording, in addition, an opportunity to the voter to nominate another potential candidate by write-in vote or to vote against the choices offered on the ballot. The order of such presidential candidates shall be determined by lot by or under the

supervision of the board. Each voter shall be given the ballots of all the parties participating in the presidential preference vote, but may vote on one ballot only.

(a) An official ballot shall be printed and provided for use in each voting district. The form of each ballot shall be substantially as follows:

1. Form 1, to be used when there are several candidates:

OFFICIAL BALLOT
PRESIDENTIAL PREFERENCE VOTE
.... Party

MARK THIS BALLOT IN ONE SPACE ONLY. You have one of 3 choices—you may either:

Express your preference for one of the persons whose names are printed on this ballot (in that case, make a cross or other similar mark in the space after that person's name); or

Vote against all of the names printed on this ballot, thus in fact expressing your preference for an uninstructed delegation from Wisconsin to the national convention of the .... party (in that case, make a cross or other similar mark in the space following "None of the names shown"); or

Write in the name of another person to become the presidential candidate of the .... party (in that case, write that person's name into the space following "Write-in candidate").

```
OLE CARLSON  .............................( )
AMOS DUNCAN  ............................( )
JAMES UNDERWOOD  .......................( )
None of the names shown  ...................( )
Write-in candidate  ...........................( )
```

2. Form 2, to be used when there is only one candidate:

## OFFICIAL BALLOT
## PRESIDENTIAL PREFERENCE VOTE
#### .... Party

MARK THIS BALLOT IN ONE SPACE ONLY. You have one of 3 choices—you may either:

Express your preference for the person whose name is printed on this ballot (in that case, make a cross or other similar mark in the space marked "YES" following that person's name) ; or

Vote against the person whose name is printed on this ballot, thus in fact expressing your preference for an uninstructed delegation from Wisconsin to the national convention of the .... party (in that case, make a cross or other similar mark in the space marked "NO" following that person's name) ; or

Write in the name of another person to become the presidential candidate of the .... party (in that case, write that person's name into the space following "Write-in candidate").

JOHN DOE ...................... YES ... (   )
NO ... (   )
Write-in candidate ...................... (   )

3. Form 3, to be used when there are no candidates who have qualified to appear on the ballot:

## OFFICIAL BALLOT
## PRESIDENTIAL PREFERENCE VOTE
#### .... Party

MARK THIS BALLOT IN ONE SPACE ONLY. There are no candidates of the .... party who have qualified to have their names appear on the printed ballot. You have 2 choices—you may either:

Express your preference for an uninstructed delegation from Wisconsin to the national convention of the

.... party (in that case, make a cross or other similar mark in the space following "Uninstructed delegation") ; or

Write in the name of a person to become the presidential candidate of the .... party (in that case, write that person's name into the space following "Write-in candidate").

Uninstructed delegation ...................... ( )
Write-in candidate .......................... ( )

(c)  The official ballots for the presidential preference vote shall be securely fastened together at the bottom. The party casting the greatest number of votes for governor at the preceding election shall have its ticket placed on top and the remaining party ballots shall follow in the same manner. A facsimile ballot notice shall be published as provided in s. 10.02.

(d)  After preparing his ballot, the elector shall detach it from the remaining ballots and shall fold it so that its face will be concealed. The printed indorsements and signatures or initials on the back of the ballot will then be visible. The remaining ballots shall be folded in like manner by the elector. The elector shall, without leaving the polling place, deliver in person the ballot on which he has expressed his presidential preference, and the remaining ballots, to one of the inspectors for deposit in the proper ballot boxes.

(e)  Immediately after the canvass the inspectors shall, without examination, destroy the ballots deposited in the blank ballot box.

(9)  REFERENDA BALLOT. The referenda ballot used at the spring election shall be the same as that used at the general election under s. 5.64(2).

5.62  **September primary ballots.** At September primaries, where necessary, the following ballot shall be

provided for each ward, in substantially the same form as annexed Ballot 1.

(1) (a) There shall be an Australian ballot made up of the several party tickets with each party entitled to participate in the primary having its own ballot, and the independent candidates for state office shall have a separate ballot for all such candidates as under s. 5.64 (1) (e). The several ballots shall be secured together at the bottom. The party ballot of the party receiving the most votes for governor at the last general election shall be on top with the other parties arranged in an order based on their vote for governor at the last general election. The ballot listing the independent candidates shall be placed at the bottom.

(b) Every political organization listed as independent and every recognized political party listed on the official ballot at the last general election that received at least one percent of the total votes cast for any statewide office, including presidential elector, which was contested at that election shall have a separate primary ballot and separate column on the general election ballot. The chairman and secretary of the organization which was "independent" at the last election shall certify to the board their party name, which shall not duplicate the name of an existing party.

(2) Any political organization may be represented by a separate ballot if, not later than June 1 in the year of a September primary, it files with the board a petition so requesting, signed either by electors equal to one-sixth of the total vote cast for governor in each of at least 10 counties at the last election or one-sixth of the electors in any senate, assembly or congressional district. When their candidates fulfill the nomination paper requirements, they shall appear on a separate ballot within the district or state.

(3) The board shall designate the official primary ballot arrangement for state offices by using the same pro-

cedure as for supreme court justice candidates under s. 5.60(1)(b); congressional and state senate candidates by using the same procedure as for circuit court judges under s. 5.60(1)(b) by numbering the assembly districts and parts of assembly districts within each congressional or senate district; and assembly candidates, by similarly numbering and arranging by population the counties within an assembly district. Independent candidates for state office shall be listed for each office in an order drawn by lot by or under the supervision of the board. The candidates shall then be listed under s. 5.60 (1)(b).

(4) The county clerk or county board of election commissioners shall designate the official primary ballot arrangement for all candidates filing nomination papers in that office.

(a) Within a county the county clerk shall arrange the names of all candidates filing nomination papers with his office using the same method as that used by the board under s. 5.60(1)(b).

(b) The county board of election commissioners in counties having a population of more than 500,000 shall prepare the official primary ballot. The commissioners shall arrange the names of all candidates for each office whose nomination papers are filed at the county level, using the same method as that used by the elections board under s. 5.60(1)(b).

(5) At the September primary, an elector may vote for the candidates of only one party, or the elector may vote for any of the independent candidates for state office listed; but the elector may not vote for more than one candidate for a single office.

**8.05 Nomination in towns and villages.** Every candidate for an elective office in a town or village shall be nominated under this section.

(1) CAUCUS. (a) When nomination papers are not used, there shall be a caucus to nominate candidates. The governing body shall between December 1 and January 1 decide the date of the caucus. The date of the caucus may be established between the first Tuesday in January and the last Tuesday in January. When possible, preference should be given to having the caucus on the last Tuesday in January.

(b) Whenever a caucus is held, the municipal clerk shall give notice of the time and date for the caucus by posting in his office and by one publication in a newspaper under ch. 985, at least 5 days before the date of the caucus.

(c) The town chairman or village president together with the municipal clerk shall serve as caucus officials. If the chairman or president is a candidate, he shall call for the election of officials to conduct the caucus. The officials shall be elected by acclamation or ballot as the meeting directs. The electors attending the meeting shall select 2 tellers to canvass the vote for each office at the caucus.

(d) Names of candidates shall be placed in nomination either by motion made and seconded from the floor or by writing the candidate's name on a slip of paper distributed by the tellers to those electors attending the caucus. Only persons placed in nomination shall be voted on.

(e) Nominations shall be made for one office at a time. Candidates for the office of town supervisor when elected jointly and of village trustee shall be considered one office for purposes of nomination and election.

(f) Before balloting the caucus chairman shall announce the names of all candidates placed in nomination.

(g) The voting for each office shall be by ballot, but the caucus chairman may dispense with voting when only one or 2 persons are nominated for the same office.

(h) The 2 candidates receiving the highest number of votes cast for each office shall be nominated and certified by the caucus chairman and tellers to the municipal clerk. The certified names of the candidates shall be placed on the official ballots. If a town under s. 5.60(6) elects its supervisors jointly, candidates equal to twice the number of positions to be filled, who receive the most votes, shall be nominated and certified.

(i) Village trustees, excluding the office of village president, shall be nominated together and at large. Candidates, equal to twice the number of positions to be filled, who receive the most votes, shall be nominated and certified.

(j) Any candidate nominated at a caucus who files a written declination of nomination within 5 days shall not be included on the official ballot.

(3) TOWN NONPARTISAN PRIMARY. (a) In lieu of sub. (1), the electors either by referendum or at the town meeting may provide for nomination of elective town office candidates at a nonpartisan primary conducted as provided in sub. (5). The nomination papers shall be signed by not less than 20 nor more than 100 electors of the town. The nomination papers shall be circulated not sooner than December 1 preceding the election and shall be filed with the town clerk not later than 5 p.m. the first Tuesday in January, or the next day if Tuesday is a holiday.

(b) Notice shall be given under ss. 10.01(2)(a) and 10.06(2)(a).

(c) When this subsection is used, no additional candidates may be nominated under sub. (1).

(d) The question of adoption of the nonpartisan primary under this subsection may be submitted to the electors at any regular election held in the town or at a special election called for the purpose. When a petition signed by 20 electors of the town is filed with the town

clerk so requesting, the question shall be submitted to a vote.

(e) Petitions requesting a vote on the question at a regular town election shall be filed no later than 5 p.m. the last Tuesday in February. When the petition is filed, the clerk shall check its sufficiency. Whether at a regular or special election, the clerk shall give separate notice by one publication in a newspaper at least 5 days before the election.

(f) The ballot used for the referendum question shall be arranged under s. 5.60 (7) and shall ask: "Shall all candidates in the town of . . . . for elective town offices be nominated at a nonpartisan primary"?

(g) If a majority of the votes cast are in the affirmative, a nonpartisan primary, under sub. (5), shall thereafter be held to obtain candidates for elective town offices.

(4) VILLAGE NONPARTISAN PRIMARY. (a) A majority of the governing body of any village may provide under s. 8.11 (1) (a) and (b) that candidates for elective village office shall be nominated by a nonpartisan primary, under sub. (5). Determination of the governing body to provide for such primary under s. 8.11 (1) (a) shall be made not later than December 1 preceding the election.

(b) Nomination papers shall be signed by not less than 20 nor more than 100 electors of the village. The papers shall be circulated not sooner than December 1 preceding the election and shall be filed with the village clerk not later than 5 p.m. the first Tuesday in January, or the next day if Tuesday is a holiday.

(c) Notice shall be given, under ss. 10.01 (2) (a) and 10.06 (3) (a).

(d) When this subsection is used, no additional candidates may be nominated under sub. (1).

(5) WHEN PRIMARY IS HELD. Towns and villages adopting the nonpartisan primary to nominate candi-

dates, under subs. (3) and (4), shall hold a primary only when the number of candidates for an elective office in the municipality exceeds twice the number to be elected to the office. Those offices for which a primary has been held shall have only the names of candidates nominated at the primary appear on the official spring election ballot. When the number of candidates for an office does not exceed twice the number to be elected, their names shall be printed on the official ballot for the regular election without a primary.

(6) MENOMINEE COUNTY. In counties containing only one town candidates shall be nominated for the office of supervisors at large and by wards, and all applicable provisions of this section shall apply to their selection. In selecting the candidates for ward supervisor by caucus, the candidates for each ward shall be selected separately, and only those electors shall participate in each as are residents of that ward. Any ward candidate seeking nomination by the circulation of nomination papers shall incorporate in his nomination papers a statement that the signers are qualified electors of that ward.

**8.12 Presidential preference vote.** (1) SELECTION OF NAMES FOR BALLOT. In each year in which electors for president and vice president are to be elected, the voters of this state shall at the spring election be given an opportunity to express their preference for the person to be the presidential candidate of their party.

(a) On the first Tuesday in February* *in each year in which electors for president and vice president are to be elected,* there shall be convened in the capitol a committee consisting of, for each political party recognized under s. 5.62, the state chairman of that state party organization, the national committeeman

---

* Chapter 34, Laws of 1979, effective July 29, 1979.

and the national committeewoman; the speaker and the minority leader of the assembly, and the president and minority leader of the senate. This committee shall organize by selecting an eleventh member who shall be the chairman and shall determine, and certify to the board no later than on the Friday following the first Tuesday in February, the names of all candidates of the political parties recognized under s. 5.62 for the office of president of the United States. The committee shall have sole discretion that such candidates' candidacy is generally advocated or recognized in the national news media throughout the United States.

(b) No later than 5 p.m. on the First Tuesday in March of said year, any person seeking the indorsement by the national convention of a political party recognized under s. 5.62 for the office of president of the United States, or any group organized in this state on behalf of and with the consent of such person, may submit to the board a petition to have said person's name printed on the presidential preference ballot. Such petition shall be signed by a number of qualified electors equal in each congressional district to not less than 1,000 signatures nor more than 1,500 signatures. All signers on each separate petition shall reside in the same county.

(c) The board shall forthwith contact each person whose name has been placed in nomination under par. (a) and notify him or her that his or her name will be printed on the Wisconsin presidential preference ballot unless he or she files, no later than 5 p.m. on the last day in February of such year, with the board, a disclaimer stating without qualification that he or she is not and does not intend to become a candidate for the office of president of the United States at the forthcoming presi-

dential election. The disclaimer may be filed with the board by certified mail, telegram or in person.

(2) BALLOTS. (a) The form of the official ballots shall be prescribed by the board under s. 5.60(8).

(b) Except as otherwise provided in subs. (1) and (3) and s. 5.60(8), the presidential preference vote election shall be noticed, held and conducted, and the results canvassed and returned, in the manner provided for judicial elections.

(2m) DELEGATE INFORMATION. The state chairman of each recognized political party having a presidential preference ballot shall certify to the board, no later than 5 p.m. on the 2nd Tuesday in March of presidential election years, the number of delegates who will be entitled to serve at the party's convention from this state. At least two-thirds of such number shall be designated by congressional district and the remainder, if any, shall be designated at-large delegates. The number of at-large delegates and the number of district delegates certified by the party shall be the total number of delegates and the total number of alternates certified for such party by the board under sub. (3) (d).

(3) DELEGATES TO NATIONAL CONVENTION. (a) In canvassing the presidential preference vote, the specific candidate for president receiving a plurality in any district or in the state at large is entitled to control all the delegates representing such area in accordance with par. (c) 5. If the choice for "none of the names shown" receives a plurality, then all the delegates from the affected area shall be uninstructed. As an alternative to this procedure, the state chairperson of any political party having a presidential preference ballot may inform the board in writing no later than 5 p.m. the 2nd Tuesday in March of each presidential election year that the delegates from such party are to be certified on the basis of proportional representation. In such case, each presi-

dential candidate shall be apportioned delegates committed to support him or her as nearly as possible in accordance with the percentage of the vote in a district or in the state at large which such candidate receives. Uninstructed delegates shall also be allotted as nearly as possible to represent the percentage of votes cast for "none of the names shown" in any district or in the state at large, in proportion to the percentage of votes cast for such option, but no fractional delegate votes shall be allowed in any party.

(am) No later than the last Monday in April following the presidential preference vote, the board shall notify each state party organization chairperson under sub. (1) (a) of the results of the presidential preference vote cast within his or her party, and the number of delegates from each congressional district and from the state at large which are to be pledged to each presidential candidate and the number which are to be uninstructed.

(b) After receiving the results of the presidential preference vote cast under par. (am), each state party organization shall select as many delegates or alternates as are allotted or permitted this state's party organization by the national committee of the political party as certified under sub. (2m) in accordance with the results of the vote cast for each candidate or for the uninstructed delegation. The method of selecting the delegates or alternates shall be determined by the state party organization, but not less than two-thirds of the convention votes shall be allotted to congressional districts and these delegates and alternates shall be selected by the party organizations of each respective district. In executing the pledge under par. (c) 5, district delegates and district delegate alternates shall be bound by the outcome of the presidential preference vote in their respective districts, and the delegates and alternates representing the state at large shall be bound by the outcome of the total presidential preference vote in the state at large

in accordance with the system of selection under par. (a) which is used by their party. The selection of delegates and alternates shall occur no earlier than the Tuesday after the last Monday in April following a presidential preference vote. The names of the suggested delegates and alternates pledged to a particular candidate shall be transmitted to that candidate for his or her approval no later than June 5, and the candidate shall notify the chairperson of the state party organization of his or her disapproval of any delegate or alternate by June 10, and where the candidate has disapproved his or her suggested delegates and alternates, he or she shall file his or her own list of delegates and alternates, which shall become that candidate's official slate of delegates and alternates to the national presidential convention. No person selected as a delegate or alternate is qualified to attend the national convention of his or her political party unless he or she files with the state chairperson of his or her political party a written declaration of acceptance, signed by himself or herself, on a form prescribed by the board, and the state chairperson deposits this declaration of acceptance in the office of the board no later than 5 p.m. on June 20.

(c) The declaration of acceptance shall be in the form of an affidavit and shall contain the following information:

1. The name, residence and post-office address of the delegate or alternate delegate.

2. A statement that he is a qualified voter.

3. A statement that he will not withdraw his name before the holding of the national convention of his party.

4. A statement that he is affiliated with the political party which selected him as a delegate or alternate to its national political convention.

5. If the delegate or alternate is selected to represent votes cast for a specific candidate for the office of presi-

dent of the United States in accordance with the method of selection used by the party under par. (a), or is selected to replace such a person, a pledge in the following form:

"As a delegate to the 19.. national convention of the .... party I pledge myself to support the candidacy of .... as a candidate for the nomination for president by the .... party; that I will, unless prevented by the death of the candidate, vote for his (or her) candidacy on the first ballot; and vote for his (or her) candidacy on any additional ballot, unless released by said candidate, until said candidate fails to receive at least one-third of the votes authorized to be cast; and that, thereafter, I shall have the right to cast my convention vote according to my own judgment".

(d) The board shall forthwith certify to the credentials committee at the national convention of each party recognized under s. 5.62 a list of the names of the delegates and alternates qualified to represent the party organization of this state by virtue of having complied with pars. (b) and (c).

(e) Any vacancy in an office of delegate or alternate to a national political party convention caused by the death, or inability for any reason to serve, of a delegate or alternate delegate shall be filled by the state committee of the political party organization entitled to make the original selection under par. (b), but no person selected to fill a vacancy under this paragraph is qualified to serve in place of any person required to execute the affidavit under par. (c) 5 unless he or she executes the affidavit.

**10.02   Type B notice content.**   (1) Before any election an appropriate type B notice shall be published in substantially the form prescribed by the board at the times prescribed in s. 10.06. The type B notice shall include

the following relevant sections and be within the guidelines established in this section.

(2) (a) The headline or caption, the introductory paragraph and the voting instructions shall be printed once at the beginning of the notice followed by a facsimile of each ballot to be used at the election. The headline or caption shall be conspicuously displayed, but the caption together with the necessary spacing above and below shall not exceed 1¼ inches in depth. The introductory paragraph and voting instructions shall be set solid in the type of the regular reading matter of the newspaper but no smaller than 5½-point nor larger than 10-point type.

(b) Following the introductory paragraph, but preceding the facsimile ballot notice, the county clerk shall publish a statement of information to electors in the form prescribed in sub. (3). When the county clerk is not required to publish the instructions, the municipal clerk may do so.

(c) The facsimile ballots shall follow the voting instructions. The size and style of type and the general display of the facsimile ballots shall be prescribed by the board and shall conform substantially to the sample ballots annexed to the statutes. The party columns shall not exceed 2⅙ inches in width and the ballot size may be reduced. Voting machine facsimile ballots shall show a reduced diagram of the front of the voting machine and instructions to electors on how to vote on the machine.

(3) The statement of information to electors shall contain the following relevant sections:

FACSIMILE BALLOT NOTICE
OF .... ELECTION

Office of .... [County] [Municipal] Clerk.
To the Electors of .... [County] [Municipality]:
Notice is hereby given of a .... election to be held in the several wards in the [county] [municipality] of ....,

on the .... day of ...., 19.., at which the officers named below shall be chosen. The names of the candidates for each office to be voted for, whose nominations have been certified to or filed in this office, are given under the title of the office and under the appropriate party or other designation, each in its proper column, together with the questions submitted to a vote, in the sample ballot below.

## INFORMATION TO ELECTORS

Voting instructions shall be given substantially as follows:

(a) Upon entering the polling place, an elector shall give his or her name and address before being permitted to vote. Where paper ballots are used, the initials of 2 ballot clerks must appear on the ballot. Upon being permitted to vote, the elector shall retire alone to a voting booth or machine and cast his or her ballot. An election official may inform the elector of the proper manner for casting a ballot, but the official shall not in any manner advise or indicate for whom to vote.

(b) 1. If an elector wishes to vote for all candidates nominated by any party, the elector shall make a cross or other mark in the circle or depress the lever or button under the party designation printed at the top of the ballot. Unless a name has been erased or crossed out, another name written in, a mark placed to the right of a candidate for the same office in another column or a sticker applied, a mark in the circle at the top of the column is a vote for all the party's candidates listed in the column. If an elector does not wish to vote for all the candidates nominated by one party, the elector shall make a cross or mark in the square at the right of or separately depress the levers or buttons next to each can-

didate's name for whom he or she intends to vote, or shall insert or write in the name of a candidate.

2. At the presidential preference primary or a special partisan primary, the elector shall select the party ballot of his or her choice and shall make a cross or other mark in the square at the right of or depress the lever or button next to the candidate's name for each office for whom the elector intends to vote, or shall insert or write in the name of the elector's choice for a candidate.

2m. At the September primary, the elector shall select the party ballot of his or her choice or the ballot containing the names of the independent candidates for state office, and make a cross or other mark in the square at the right of or depress the lever or button next to the candidate's name for each office for whom the elector intends to vote or insert or write in the name of the elector's choice for a party candidate, if any. In order to qualify for participation in the Wisconsin election campaign fund, a candidate for state office at the September primary must receive at least 6% of all votes cast on all ballots for the office for which he or she is a candidate, in addition to other requirements.

3. When casting a presidential preference vote, the elector shall select the party ballot of his or her choice and make a cross or other mark in the space at the right of or depress the button or lever next to the candidate's name for whom he or she intends to vote or shall, in the alternative, make such a cross or mark in the space at the right of or depress the button or lever next to the word "no" when only one candidate is shown on the ballot or "none of the names shown" when several candidates are shown on the ballot, or shall write in the name of his or her choice for a candidate.

4. At a nonpartisan primary, the elector shall place a cross or other mark in the square at the right of or depress the button or lever next to the candidate's name

for each office for whom he or she intends to vote, or insert or write in the name of his or her choice for a candidate.

(c) In presidential elections, the elector shall place a cross or other mark in the square at the right of or depress the button or lever next to the set of candidates for president and vice president for whom he or she intends to vote. The vote shall be counted for all the candidates for presidential electors of those candidates.

(d) On referenda questions, the elector shall make a cross or other mark in the square at the right of or depress the button or lever next to the answer which he or she intends to give.

(e) The vote should not be cast in any other manner. If the elector spoils a ballot, he or she shall return it to an election official who shall issue another in its place, but not more than 3 ballots shall be issued to any one elector. If the ballot has not been initialed by 2 ballot clerks or is defective in any other way, the elector shall return it to the election official, who shall issue a proper ballot in its place. Not more than 5 minutes' time shall be allowed inside a voting booth or machine. Unofficial ballots or a memorandum to assist the elector in marking his or her ballot may be taken into the booth and copied. The sample ballot shall not be shown to anyone so as to reveal how the ballot is marked.

(f) After an official paper ballot is marked, it shall be folded so the inside marks do not show but so the printed indorsements and ballot clerks' initials on the outside do show. After casting his or her ballot, the elector shall leave the machine or booth, and where paper ballots are used, give his or her name to the inspector in charge of the ballot box, hand the inspector his or her folded ballot to be placed in the ballot box, and shall leave the polling place promptly.

(g) An elector may be assisted by 2 election officials of different political parties in casting his or her vote

if the elector declares to the presiding official that he or she is unable to read, has difficulty reading, writing or understanding English or that due to physical disability is unable to cast his or her ballot. Alternatively, an elector making such declaration may have another elector of the county assist in marking the ballot or operating a voting machine. The presiding official may administer an oath to a person making such declaration.

(h) The following is a facsimile of the official ballot: (insert facsimile of ballot)

.... , (County Clerk)
(Municipal Clerk)

(4) No further publication of notice provided for by this section or by a type B notice shall be required by the county or municipal clerk.

COFFEY, J. (concurring) I concur with the court's opinion that the spring primary law is constitutional and binding on the state and national parties and that Wisconsin's spring primary election is one of the most important progressive traditions of this state. The court rightly refuses to be a party to manipulation of the people's right to vote in an open and binding primary election. What is in conflict is the National Democratic Party's desire to limit the people's freedom of choice as opposed to the interests of the state in maintaining and increasing voter participation in the process by which our national leaders are chosen. The instrument used by the National Democratic Party, the public declaration of party affiliation, is poorly designed to further its announced goal of freedom of association. The associational interest thus advanced is greatly outweighed by the state's interest in protecting the privacy of the voting booth, encouraging full participation in the electoral process and maintaining the integrity of the Wisconsin nonpartisan spring election of local town boards,

municipal, county and school boards and members of the state judiciary. Party politics has no place in the selection of those responsible for the education of our children.

Further, nothing could be more destructive of the concept of an independent, elected judiciary than party politics. This court has made it very clear that judges are not to become involved in party politics. Rule 12 of the Code of Judicial Ethics provides as follows:

"A judge shall not be a member of any political party or participate in its affairs, caucuses, promotions, platforms, endorsements, conventions, or activities. He shall not make or solicit financial or other contributions in support of its causes, or publicly endorse or speak on behalf of its candidates or platforms."

Is it the intent of the National Democratic Party to disenfranchise 190 trial judges, 12 appellate judges and 7 justices of the supreme court of their constitutional right to vote on April 1, 1980?

A closed primary, where the only participants are those who publicly announce their affiliation with a political party, would seriously undermine the nonpartisan judicial elections to be held at the same time. The pressures on a candidate to violate the foregoing rule would be enormous. It is intolerable for the National Democratic Party to seek to impose on the state of Wisconsin a primary election system which would infringe on our independent, elected judiciary and our nonpartisan elected town, county, municipal and school board officials.

Robert M. La Follette, Sr. promoted the open primary as a means of restoring lost confidence in government. In these days when suspicion is so strong as to almost approach a belief in the dishonesty and lack of integrity of our government officials, it is most imperative that the electorate have and exercise its right to participate in the selection of candidates, as well as the right to

choose between the candidates selected. The Wisconsin voter is equally competent to cast his or her ballot at the primary or the general election. Invading the voter's privacy by requiring party affiliation be a matter of public record places undue pressure on the voter not to participate. Many will not take the chance that their names will appear on mailing lists and their privacy be further invaded. They will leave the field to the party professionals, the political bosses.

The Wisconsin open primary is more than an anti-bossism tradition as old as this century. It is also conducted at the same time as the nonpartisan spring election. These elections are another important Wisconsin tradition.

It is no answer to say that the primary election can be open so long as it is not binding on the delegates. The legislature has declared an open and binding primary election to be the public policy of the state of Wisconsin.

In recognizing this, our court has prevented the application of the unfortunate policy of the National Democratic Party so as to impose a closed or non-binding primary on the citizens of Wisconsin. I agree.